J. WEINGARTEN, Inc., Appellant,

v.

Joseph J. GAUTHIER et ux., Appellees.

No. 6105.

Court of Civil Appeals of Texas.

Beaumont.

July 12, 1957.

Rehearing Denied Sept. 18, 1957.

Remittitur Filed Sept. 24, 1957.

Marcus, Weller & Evans, Beaumont, for appellant.

Keith, Mehaffey, McNicholas & Weber, Beaumont, for appellee.

HIGHTOWER, Justice.

The suit was to recover damages for personal injuries sustained by Helen Gauthier, while a business invitee in a retail grocery store operated by appellant, J. Weingarten, Inc., in Port Arthur, Jefferson County, Texas. She was joined by her husband, Joseph Gauthier. Appellees' cause was pitched on the doctrine of res ipsa loquitur.

The petition alleges that on September 19, 1955, the appellee entered appellant's store and made purchases therein and while leaving said store by means of a "magic eye" door, the same suddenly closed upon her body, striking her with great force and inflicting serious and painful injuries upon her; that the door provided for the public by appellant was a peculiar type of mechanical door for use by the patrons and prospective patrons of said store which said door is activated by some type of electrical impulse when a person crosses a ray of light; that, under ordinary circumstances, said doors open when the ray of light is interrupted by a person crossing its path and said doors stay open until such person has had ample time to go through said door, whereupon the said door automatically closes unless another person immediately interrupts said ray of light; that the type of door and door opener in use in the defendant's said store is not the usual and customary type of door in general use throughout Jefferson County, Texas, but upon the contrary is a type found in only a few places therein; that these plaintiffs are not versed in electricity or electronics and are unable to describe the exact means, method, and manner in which said doors are designed to operate but they do allege that such knowledge is known to the defendant and its agents; further, the plaintiffs allege that the said door and door opener used by the defendant in its said store ordinarily, usually, and but for some negligent act, wrong, or omission of the defendant, works and permits patrons to enter or leave said store without danger of physical injury or harm to their person; that the mechanism of said door and its opener are exclusively within the possession of the defendant and not within the possession of the plaintiffs; that, by reason of the foregoing, the plaintiffs herein are entitled to rely upon the doctrine of res ipsa loquitur in holding the defendant liable for the events hereinafter set forth.

Plaintiffs show that heretofore, and on or about the 19th day of September, 1955, the plaintiff, Helen Gauthier, was a patron of the defendant's said store, having entered the same to make purchases of merchandise therein and having actually made some purchases therein; that, upon said date, as she was leaving the store by means of the exit furnished for patrons, the heavy door which was opened by the electrical impulse as aforesaid, suddenly and without warning closed upon the plaintiff's body striking her with great force and violence and inflicting serious, permanent, and painful injuries upon her as shown more specifically hereinafter. * * *

Prefaced by one untenable exception to the petition, the answer consisted of a general denial, contributory negligence and unavoidable accident.

The following were the liability issues submitted to the jury:

"Special Issue No. 4

"Do you find from a preponderance of the evidence that the door opening mechanism was under the exclusive control and direction of the defendant, J. Weingarten, Inc., and its agents and employees?

"Answer: 'Yes' or 'No.'

"Answer: Yes.

"If you have answered the preceding special issue by 'Yes' and only in such event, then answer:

"Special Issue No. 5

"Do you find from a preponderance of the evidence that the defendant failed to use ordinary care in the maintenance of the door mechanism on the occasion in question?

"Answer: 'It failed,' or 'It did not fail.'

"Answer: It failed.

"If you have answered the preceding special issue by 'It did fail', and only in such event, then answer:

"Special Issue No. 6

"Do you find from a preponderance of the evidence that such failure to use ordinary care, if you have so found, was a proximate cause of the injuries, if any, sustained by Helen Gauthier?

"Answer 'Yes' or 'No.'

"Answer: Yes."

Appellant timely and in limine moved the trial court for an instructed verdict and judgment non obstante veredicto, by motions embodying substantially the points of error upon which this appeal is predicated, and these motions having been refused it has here grouped and briefed its first five points of error together, and they will be so determined by this court.

As stated by appellant, points 1 to 5 advance the proposition that there was no evidence, or at least insufficient evidence to show any negligence of appellant proximately causing any injury to Mrs. Helen Gauthier, regardless of whether the inference allowed under the res ipsa loquitur rule is indulged; that even if the doctrine of res ipsa loquitur is applicable to the situation shown by this record, there is a lack of proof as to certain vital elements of the doctrine; and that while appellant contends that the res ipsa loquitur doctrine is inapplicable here, nevertheless certain necessary findings of the jury are lacking; that this amounts to the proposition that the judgment is without proper support in either the evidence or jury findings.

The opinion by the Commission of Appeals in Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659, 665, and authorities there cited, has considerably moulded our opinion that appellant's first five points are without merit in the circumstances. There we find the principal hurdles a plaintiff must surmount when resting his case on this doctrine:

* * * " the thing which cause[s] the injury complained of must be under the management or control of [the] defendant, and the accident must be such as in the ordinary course of things does not happen if those who have the management or control use proper care."

Before analyzing the evidence in the light of the legal principles relative thereto we should state that it appears undisputed that the appellant had the exclusive control and management of the door in question. The testimony relevant to the latter portion of the foregoing principle follows:

Mrs. Gauthier stated that on the date of her injury she had gone to appellant's store and after making certain purchases, was making her exit through the door in question in the normal and customary manner when the mishap occurred as alleged, suddenly and without warning. We feel that the "normal manner" is so commonly known as not to require a detailed description of her testimony in such respect. Suffice it to say that her testimony was in substantial accord with the allegations in her petition.

Sam Vacarella, Manager of appellant's store, testified substantially that the appellant kept its own crew of maintenance employees for the repair work ordinarily required on the doors, but that on some occasions mechanics were employed from a firm in Houston, Texas, to make these repairs; that immediately after the accident he had ordered the door in question secured as a precaution against further accidents; that on one day prior to the Saturday immediately following the Monday on which Mrs. Gauthier was injured, one of appel-

lant's repairmen had come over from Houston and fixed the door; that

"Q. But when you are going out the 'out door', there will nothing happen to you if the thing is working right, will it? A. No, sir.

"Q. If anybody gets hurt in it, then there is. something wrong with the door, isn't there? A. That's right.

"Q. There is no doubt in your mind about that? A. That's right.

"Q. Nobody else does, or is supposed to do anything with that door but Weingarten's? A. That's right."

Pressley Huval, appellant's assistant superintendent of maintenance and construction from Houston, stated that work orders were used by the repairmen after work had been done to the electrical and mechanical equipment of appellant's stores and that they were thereafter turned in to him in Houston. It has been noted that this witness made no explanation of what was done in the way of repairs to the door in question immediately following Mrs. Gauthier's injury, nor was there any offer made of the records allegedly evidencing such repairs.

James G. Greer, offered by appellant as a man well versed and experienced in the maintenance and repair of such doors, stated that shortly after the accident he had dispatched one of his maintenance men from Houston to repair the door; that the repair work was done under his orders and directions, and that he had a record of what was done to the door. He offered no explanation of what was found to have been wrong with the door, nor was the record, which he professed to possess offered in evidence.

We are of the opinion that the foregoing testimony established a prima facie case for the jury's consideration under the doctrine of res ipsa loquitur and had the effect of placing the burden of rebutting its effect upon the appellant by introducing evidence to explain or otherwise

overcome the presumption or inference that the injury complained of was due to negligence. This they failed to do. Their only effort in such connection being a detailed statement by witness Greer of things that could have caused it—not what actually did cause the malfunction of the door. His testimony to this effect being that there could be a short in the electrical devices operating the door, and that such could cause the door to fail to remain open long enough for a person to pass through; that a cell itself in the electrical mechanism could have failed, also causing the door not to operate and that these two things were the only things that he could think of that would cause an occurrence such as related by Mrs. Gauthier; that such things can happen just overnight, without any warning; that maybe 500 people could pass through the door and maybe the 500 and first, without any advance warning, would find the door to be not operating properly; that these shorts, or cells, could go out suddenly without warning as do light bulbs in a house.

As held in the Elliott case, supra, "While the naked fact that an accident has happened may be no evidence of negligence, yet the character of the accident and the *circumstances in proof attending it* may be such as to lead reasonably to the belief that, without negligence, it would not have occurred * * * that the fact of the occurrence of an injury and the *surrounding circumstances* may permit an inference of culpability on the part of the defendant, making out plaintiff's prima facie case, and present a question of fact for the defendant to meet with an explanation * * *; that the term *'surrounding circumstances'* in this connection refers not to circumstances directly tending to show lack of care * * * which tend in [itself] to establish plaintiff's case, but only to mere neutral circumstances of control and management by the defendant, which may, when explained, appear to be entirely consistent with due care." (Emphasis ours.)

While not concluding necessarily that appellees had made out a prima facie case under the doctrine by merely showing that the appellant had exclusive control and management of the door and that the accident occurred by reasons unknown to appellees, and that they had no knowledge or means of determining why the door failed to operate properly, we do hold that when proof was made that the appellant had personal knowledge of the fact, and even testified that they had documentary evidence of the fact, that their failure to explain the reasons why the door was in a defective condition was a material "circumstance in proof" which strongly raised the inference or presumption that the accident would not have occurred but for their negligence, and appellees were not required to negative every circumstance which might possibly arise whereby the incident would not have occurred. Texas & Pac. Ry. Co. v. Riley, Tex.Civ.App., 183 S.W.2d 991, and cases cited; Wichita Falls Traction Co. v. Elliott, supra.

Under points 6 and 7 we find the appellant complaining of the trial court's manner of submitting the liability issues as hereinabove set forth, which complaint was seasonably pointed out in appellant's objections to said issues in the trial court thusly:

"A. Such doctrine is not applicable here, and such issues should not be submitted for the reason that there is no evidence to show that an occurrence of the nature in question would not have occurred except where there has been some sort of negligence on defendant's part; but on the contrary the undisputed evidence shows that such occurrences happen and can happen, due to unexpected and unforeseeable mechanical failure occurring in the absence of negligence.

"B. Such issues do not require the jury to find that the occurrence in question would not have happened if the defendant had exercised ordinary or proper care, and thus does not submit all the necessary elements for a finding of negligence under such doctrine.

"C. Such does not advise the jury that if the defendant has given them a reasonable explanation of such occurrence, they may consider such in determining whether it was negligent on the occasion in question.

"D. (Appellant's objection to Issue No. 5) The same is too broad and general and does not confine the injury to any particular act or omission."

■■ It is to be noted that most of the matters complained of by objection "A" have been disposed of in our discussion under appellant's first five points, but complaint is further made by this objection to the effect that because of the undisputed testimony of witness Greer, as above set out, to the effect that such occurrences happen, and can happen, due to unexpected and unforeseeable mechanical failures occurring in the absence of negligence, that the appellees were not entitled to Special Issue No. 5, inquiring of appellant's negligence to the jury. This objection is without merit, as Greer's testimony obviously amounted to nothing more than an explanation to the jury of some of the reasons why the door in question could have failed to operate properly. It in no manner relieved appellant of its burden of going forward with the evidence in rebuttal of appellees' prima facie case established by the testimony that appellant had personal knowledge of why the door failed to operate properly and declined to submit such knowledge of the facts to the jury. Moreover the jury was not required to speculate on the cause of the accident based on such theoretical testimony.

Objection "B" if sustained would only amount to the converse of Issue No. 5 as submitted, and we fail to see how such converse submission could have been more proper in the circumstances and accordingly hold such objection to be without merit.

In connection with objection "C", the record reflects that appellant failed to request such an instruction of the trial court and for such reason alone it may not be here considered.

Appellant's objection "D", we think, has been clearly determined in our discussion under the first five points of error to the effect that the testimony raised a sufficient presumption or inference of negligence to take the case to the jury under the doctrine of res ipsa loquitur.

In connection with appellant's points 8 and 9, it was established on the trial by the testimony of appellees that shortly after her injuries she selected and secured the services of two different physicians solely of her own choice, the first being a Dr. Curry, "because he had operated on me. He was my doctor." Then it was established that she also selected and received the services of one Dr. Tritico, of her own volition. It was further established that she had been seen by Dr. Curry twice and by Dr. Tritico seven or eight times and that at the time of trial both of said doctors were in Port Arthur, Texas, a city of some 17 miles distance from the site of trial, (Beaumont, Texas) and in the same county of Jefferson.

As reflected by defendant's Bill of Exception No. 1, after the conclusion of the testimony and before any argument of counsel to the jury, the following proceedings were had in the court's chambers:

Counsel for Appellees: "The plaintiffs move the court, in the absence of the jury, and prior to the commencement of the argument, to instruct counsel for the defendant not to comment upon the failure of plaintiffs or their counsel to produce Drs. Curry and Tritico on the trial of this cause, for the reason that the testimony discloses that each of said doctors is equally available to the defendant as to the plaintiffs, and under the doctrine of Texas Employers Ins. Ass'n v. Hicks, Tex.Civ.App., 237 S.W.2d 699, n. r. e. which the plaintiffs now call to the attention of the court, such comment would be improper and, under the language of

the Hicks case, would constitute reversible error, for which reason the plaintiffs request the court to instruct the defendant's counsel not to comment thereon." Thereupon the trial court sustained such motion with the instruction to appellant's counsel that he was not to comment on the failure of appellees to produce Drs. Curry and Tritico as witnesses in their behalf, and not to mention any witness and comment upon his failure to be there, but that appellant would be privileged to comment on the fact that the plaintiffs had not produced any medical witnesses to substantiate their claim of injury.

These matters reflected by the aforesaid Bill of Exception were qualified by the trial court and accepted by counsel for appellant as follows: "Pursuant to the ruling of the court, defendant's counsel refrained from commenting upon the failure of the plaintiffs to produce Drs. Tritico and Curry, but defendant's counsel repeatedly commented in his argument upon the failure of the plaintiffs to produce any medical evidence in support of their claim and upon the fact that the only medical evidence introduced was by defendant."

We hold such action by the trial court to be clearly erroneous, though not reversible error for the reasons hereinafter stated. The Hicks case, supra, relied upon so strongly by appellees bears little analogy to the facts in these particulars in the case at bar, for the reason that in the Hicks case it was held to be reversible error for the appellees to comment on the failure of the other party to produce a physician witness who was shown to be at the time of trial out of the county and not subject to call of either party litigant. Such was not here the case as aforesaid, and although these witnesses were shown to have been equally available to the appellant, it is not presumed in the circumstances that it should call witnesses presumably interested in appellees' behalf and who, in all probability, would be prone to testify in hostility to appel-

lant's cause. We think the following comment by the Supreme Court in Meyer v. Great American Indemnity Co. 154 Tex. 408, 279 S.W.2d 575–579, is determinative of the question:

"Dr. John Bunting, who at respondent's request had examined petitioner a few months before the trial, was not offered as a witness by either party. We agree with the Court of Civil Appeals that counsel for petitioner was entitled to call the jury's attention to the fact that the doctor did not testify. Consolidated Underwriters v. Lowrie, Tex.Civ.App., 128 S.W.2d 421 (wr. ref.)."

■ Holding such error of the trial court to be harmless in the circumstances, we refer to Vernon's Ann. Texas Rules, Rule 434, paragraph 2 thereof, to the effect that no judgment shall be reversed on appeal " * * * on the ground that the trial court has committed an error of law * * * unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case * * *." The record reflects that there were only three doctors named in the evidence before the jury throughout the trial of the whole case. Dr. Crager testified in appellant's behalf and Mrs. Gauthier and her husband testified, and were interrogated lengthily, in regard to Mrs. Gauthier's selection of and treatment by her doctors, Curry and Tritico. These doctors were clearly and repeatedly presented to the jury in the course of the trial as the only doctors having any knowledge of Mrs. Gauthier's injuries or the effects thereof, and the appellant's argument to the jury as reflected by the court's qualification of the appellant's Bill of Exception could leave no doubt in the minds of any jurors, even of considerably less than ordinary intelligence, that appellant's counsel was definitely alluding to the appellees'

failure to produce Drs. Tritico and Curry, whether specifically referred to by name or not. In these circumstances it is difficult to conceive that the verdict of the jury would have been otherwise had the court permitted appellant's counsel the full privileges we believe he was entitled to in the argument, and appellant's 8th and 9th points are accordingly overruled. Aultman v. Dallas Ry. & Terminal Co., 152 Tex. 509, 260 S.W.2d 596–600.

By its 10th point, appellant complains that the court erred in refusing to allow it to show by the witness, James H. Greer, an expert with respect to the kind of door which struck appellee, Helen Gauthier, the nature of the inspection and service performed by his servicemen on doors of the same make and design as that involved here, such testimony being highly material on the question of appellant's failure to use due care in its inspection and maintenance of such door.

Prior to offering this testimony, appellant established that witness Greer was one who would be considered an expert in the service and maintenance of the "magic eye" type Stanley door in question. He testified that he was a licensed professional civil engineer employed by a firm who were agents for the Stanley Works of New Britain, Connecticut; that he had some four or five years experience in the servicing and maintenance of these doors; that his firm had contracts with several business firms of the Sabine Area, including Beaumont, Port Arthur and Orange, for the service and maintenance of similar doors; that in Beaumont he supervised some seven or eight locations having similar type doors and in Orange four locations; that there are about 500 such doors under his supervision in Houston, Texas; that it was customary for his firm to service the doors of their customers each three months; that his firm had not installed the doors in appellant's store, and that his men were called only in emergencies by appellant to do repair work. Appellant then sought to elicit information from Greer as to his

firm's custom and manner of the periodic inspections of the doors of their customers in the Sabine Area, to which objection was made by the appellees that such testimony would be irrelevant and immaterial inasmuch as Greer's firm did not regularly service or inspect the doors of appellant. The objection was sustained, whereupon counsel for appellant re-offered the testimony with the statement that, "they are charging us with failure to inspect—we want to show what is the usual and ordinary inspection that is necessary in maintaining a similar type door to the one that Weingarten's has * * *, how often it is necessary to check and service that type of door." The objection was again sustained, the trial court informing the appellant's counsel that he could have a full Bill on what the witness would have testified had he been allowed. The Bill was never made by appellant and we do not have such information before us.

◼ The offer of this testimony prior to the establishment of the methods employed by appellant with their door amounted to nothing more than possibly an assurance to the court by appellant that if it be allowed, such evidence would be connected up later in the trial by establishing that appellant followed a similar procedure in the inspection and servicing of their doors. The trial court was not bound to accept such assurance and did not abuse its discretion in sustaining the objection to the testimony. Withee v. Fearing, 23 Tex. 503, 504; Gulf C. & S. F. Ry. Co. v. Levy, 59 Tex. 542, 543, 46 Am.Rep. 269. Moreover, appellant having failed to bring forward by Bill of Exception informing us what Greer would have testified to had he been allowed, we are unable to review the error, if any, in the exclusion of the testimony. See: 3-A Tex.Jur. 534; Atlantic Pipe Line Co. v. Fields, Tex.Civ.App., 256 S.W.2d 940, n. r. e.; Gulf Paving Co. v. Lofstedt, 144 Tex. 17, 188 S.W.2d 155, 159; Biggins v. Gulf C. & S. F. Ry. Co., 102 Tex. 417, 118 S.W. 125, 126; J. Weingarten,

Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698, 699.

By its 11th point appellant complains of the court's refusal to give the following special instruction, which was timely tendered:

"In passing upon the question of whether the door in defendant's store was maintained in a negligent manner, you are instructed that a proprietor of a store is not an insurer of the safety of customers on its premises, but is under the duty only to exercise ordinary care, as that term has been defined, to keep the premises in a reasonably safe condition and to give warning of hidden perils or unsafe conditions in so far as can be ascertained by reasonable inspection and supervision."

◼ We have previously, in overruling appellant's first five points, concluded that the cause was properly submitted under the doctrine of res ipsa loquitur which should dispose of the 11th point of error. However, it may be added that the court's charge properly defined the term "negligence" as failure to use ordinary care, and "ordinary care" was defined as that care which an ordinary prudent person would use under the same or similar circumstances. These definitions read to the jury in connection with Special Issue No. 5, hereinabove set out, inquiring if the defendant's failure to use ordinary care in the maintenance of the door clearly informed the jury of the standard by which they must measure the defendant's liability. By such issue and definitions they were clearly informed that defendant was not an insurer of Mrs. Gauthier's person in any event and at all costs. Moreover, in connection with Rule 277, T.R.C.P., and as held in Texas & N. O. R. Co. v. Crow, 132 Tex. 465, 123 S.W.2d 649, and cases there cited, the requested instruction amounted to a general charge and was not explanations or definitions of legal terms, but was instructions upon the legal duties of appellant. See:

Johnson v. Zurich Gen. A. & L. Co., 146 Tex. 232, 234, 205 S.W.2d 353; Tripp v. Watson, Tex.Civ.App., 235 S.W.2d 677; McDonald's Texas Civil Practice, Sec. 12.-14 and cases cited. Appellant's 11th point is overruled.

Appellant's 12th and 13th points, briefed together, complain of the submission of the damage issue No. 10 and its accompanying instructions which was submitted as follows:

"Special Issue No. 10

"What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will fairly and reasonably compensate the plaintiffs for the injuries, if any, sustained by Mrs. Helen Gauthier, taking into consideration the following elements of damage, if any, and none other?

"Answer by stating the amount, if any, in dollars and cents, or by 'None'.

"Answer: $10,000 (Ten Thousand Dollars)

"In answering the foregoing issue, you are instructed that you may take into consideration the following matters and things, and no others:

"(a) The injuries, if any, sustained by Helen Gauthier, including the physical and mental pain and suffering, if any, sustained by her up to the time of this trial, and physical and mental pain, if any, which in reasonable probability she may suffer in the future beyond the date of this trial.

"(b) The pecuniary value of the diminished capacity, if any, of Mrs. Helen Gauthier for work and service as a housewife in the past and up to the time of this trial.

"You will not consider nor allow any recovery for pain and suffering, or loss of earning capacity, caused by infirmities of her body, existing at the time of her injury, if any, except such pain, if any, as may have resulted from an aggravation of her prior infirmities by such injury, if any."

Appellant timely presented to the trial court the following objections to this issue, and present the same to this court in the following language:

"(a) Such does not confine the jury to consideration of injuries which they find were proximately caused by the defendant's negligence, which would permit the jury to assess damages for any and all injuries, disabilities, and conditions which they might find Helen Gauthier suffered, even though they were not caused, brought about, or aggravated by the defendant's negligence.

"(b) There is no competent evidence to show that there would be any decreased capacity of Mrs. Helen Gauthier to perform work as a housewife in the future, and such element of damages should be eliminated.

"(c) There is no competent evidence that Mrs. Helen Gauthier will suffer any physical and mental pain beyond the date of the trial.

"(d) Such would allow double damages by allowing the jury to find damages for both physical pain and mental pain, when the same are so blended and intermingled that they cannot be reasonably separated.

"(e) Such does not affirmatively exclude from the jury's consideration any mental pain, nervousness, etc., caused by anxiety of Mrs. Helen Gauthier over the fact that a tumor was found in her breast several weeks before the occurrence made the basis of this suit and which was not related to her alleged injury, and would permit the jury to allow damages for such anxiety and mental pain.

"(f) Such would permit double damages, by inquiring as to the amount of money which would compensate 'plaintiffs', thus leading the jury to believe

that they should make an award to plaintiff Joseph J. Gauthier, and also an award to his wife, when there is only one recovery, if any, accruing to them or either of them, and the inquiry should be made as to what sum would compensate the husband and not the husband and wife.

"(g) By instructing the jury that they may take into consideration 'the injuries' sustained by Helen Gauthier, and also her past and future mental and physical pain, and her past and future decreased capacity, the jury are allowed to make an award for 'injuries' over and above the other elements enumerated, which enumerated elements constitute all of the elements they may properly consider, and such instruction is reasonably calculated to cause an excessive verdict.

"(h) The instruction to the jury to consider 'injuries', in addition to the specific elements enumerated, is vague, confusing, and gives the jury no guide as to what they may consider in assessing damages for particular injuries, and is reasonably calculated to cause an excessive award."

 In its argument under these points appellant has presented several authorities, such as 13 Tex.Jur., Secs. 340 and 341, pages 552 and 554; International Great Northern R. Co. v. King, Tex.Com.App., 41 S.W.2d 234; Yessler v. Dodson, Tex.Civ. App., 104 S.W.2d 95 and Missouri K. & T. Ry. Co. v. Hannig, 91 Tex. 347, 43 S.W. 508, setting forth the well established principle that a charge is erroneous when it permits recovery of double damages, but an analysis of those charges held to be erroneous reveals that they bear little analogy, if any, to the charge of which complaint is here made. A careful study of the plaintiffs' petition and the evidence submitted in the trial of the case at bar compels the decision that appellant's 12th and 13th points should be overruled without needless elaboration.

Under its remaining two points of error, Nos. 14 and 15, appellant contends that the jury's award and assessment of damages in the sum of $10,000 is so excessive and against the great weight and preponderance of the evidence, and is so clearly wrong that the trial court should have granted a new trial or should have required a substantial remittitur.

We are of the opinion that these points should be sustained and as explanatory of such decision we feel it is necessary to a fair statement of the record that we set out all of the pertinent testimony relating to appellees' injuries and damages, as follows:

Mrs. Gauthier testified: "I had an operation on my right breast about six weeks before the accident and they had removed a lump. The stitches had been removed and the skin had resumed its normal color. The operation was not bothering me. I had just begun to do my work. When this door struck me, it hit me on my breast and shoulder a violent blow and it felt like it just started burning. I managed to push on the door and get out." She testified further: "Q. That night did you go to the hospital or stay at home? A. No, sir, I stayed at home.

"Q. What was your condition that night? Were you suffering any pain and discomfort? A. Oh, yes, sir.

"Q. What was the nature of it? A. It was still burning; my shoulders were still burning, and I just went to bed.

"Q. What did you do the next day? A. I stayed in bed—went back to the doctor, but I was in bed when I wasn't in the doctor's office.

"Q. Did you have any bruises or cuts or anything, that a person could see with the naked eye—that is, the normal lay person, as distinguished from a doctor? A. My breast was bruised, and I had a bruise on my arm.

"Q. A discoloration? A. Yes, sir.

"Q. Could a person untrained in medicine see those bruises? A. Yes, sir.

"Q. How long did the bruises stay on there, where they were noticeable? A. About 4 or 5 days.

"Q. At the end of those 4 or 5 days, when the bruises disappeared, were you completely recovered from the effects of that, or did you feel? A. I was really hurting, and getting so worried, my nerves were getting the best of me.

"Q. What were you worried about? A. I was just scared.

"Q. You were afraid this blow might— was that what was worrying you? A. That, and it hurt, hurt. .

"Q. Did it hurt you all the time or just occasionally? A. It would hurt me all the time.

"Q. Does it still hurt all the time, Mrs. Gauthier? A. No, sir, I get sharp pains in my breast, and goes back to my shoulder blade. It will maybe come on two or three times a day, maybe one or twice.

"Q. During that time immediately following this, did you take anything for rest, or sedatives, or anything of that nature? A. Oh, yes, sir.

"Q. What would you take to get relief from the pain that you were suffering there? A. Well, the doctor gave me some pills, and something to relax my nerves and make me sleep.

"Q. Did you get any relief from those treatments? A. Some.

"Q. Before this occurrence out at Weingarten's, what was the condition of your nerves? Were you nervous? A. No, sir.

"Q. I notice you are crying now. Did you do that before this occurred? A. No, sir.

"Q. Do you have spells such as you have now, from time to time? A. Yes, sir.

"Q. Did you ever have those before? A. No, sir.

"Q. After this occurrence at Weingarten's, were you able to do the house work? A. No, sir.

"Q. What kept you from being able to do the housework? A. I was hurting too bad.

"Q. What would hurt? A. My shoulder and my breast.

"Q. Did you try to work? A. After the doctor told me to try to work.

"Q. You testify he told you, but did you try? A. I tried.

"Q. Could you do it? A. No, sir.

"Q. How did you get the housework done? A. I hired it done.

"Q. You hired someone to come in and help you with it? A. Yes, sir.

"Q. What did you use to help you? A. A colored girl helped me.

"Q. What did she do? A. Washed and ironed and cleaned house.

"Q. Did you pay her for that? A. Yes, sir.

"Q. How much did you pay her for that work? A. It was $4.00 per day.

"Q. And how many days a week did she work? A. First I paid her by the week.

"Q. That is working every day, by the week? A. Yes, sir.

"Q. How long did she stay with you on that? A. Until we couldn't afford to keep her.

"Q. And then what did you do? A. I had a maid to do my washing and ironing.

"Q. Who did the washing and ironing? A. The colored girl.

"Q. And the rest of that, who did it? A. My husband helped a lot, when he would come in from work.

"Q. What is your principal complaint now, Mrs. Gauthier? That is, as of now, speaking of today, and yesterday? A. Still have the pains in my breast and shoulder; my arm still bothers me, and I can't do my housework.

"Q. Did you say something about your arm going numb? A. Yes, sir, just loses all feeling.

"Q. What about your nervous condition? Are you or are you not nervous? A. Yes, sir, I'm nervous.

"Q. This happened about nine months ago. In the last 6 months has your condition improved any? A. Not too much.

"Q. Well, has it improved any? A. Yes, sir, some.

"Q. How about your nervousness, is it getting better or worse? A. No, sir, it's not doing any better.

"Q. That is not doing any better at all? How about your arm and shoulder; is it getting better or getting worse? A. Just about the same.

"Q. Since when has it quit improving? A. Five or six months ago.

"Q. Did anything happen to your eyes in this accident? A. Just a swelling. They did that right after the accident and it's coming back on me now.

"Q. Have you tried to do your housework? A. Yes, I have.

"Q. Can you do it? A. No, I can't.

"Q. What happens to your nerves? Do you get upset, or how does that nervous condition affect you? A. I'm so nervous, I just don't want to be around anybody; want to be by myself."

. The following testimony of Joseph Gauthier, Mrs. Gauthier's husband, has been paraphrased by appellees in their brief without, as candidly stated by their counsel, "the appellees getting any of the worst of it":

"I am a 27-year old painter living in Port Arthur where I have lived for about 5 years, having come from Alexandria, Louisiana. Mine is irregular work—sometimes I have a lot of work and sometimes I go 2 or 3 weeks without work.

"I have been married to Helen Gauthier since December 12, 1947 and we have a daughter, Peggy Marie, who is 7 years old and a boy two and a half, will be three in November.

"Before her accident my wife was doing all of our housework, taking care of the children, washing and ironing, cooking, and all such as that. She had been to the hospital in July to have an operation on her breast but she got along fine after she got home and went on with her house duties and I didn't see anything irregular about it.

"Before the accident she was as cool as any other woman would be; kept up her house work and got along fine.

"After the accident I saw where she was bruised by some object on her right shoulder, right arm, and right breast, the one she had had the operation on. She was in pain—I could see that. She had to sleep on her back; she couldn't sleep on either side, due to the injury; and she was upset and nervous—scared mostly; complained of her shoulder and breast and arm was continuously hurting—a stinging and burning feeling.

"I applied the heating pad, and rubbed her down with rubbing alcohol, tried to relieve the pain in her shoulder and arm. I could feel that she was running a fever that went in her breast and shoulder.

"As the days and weeks and months went along, I could see that the least little thing, she was always upset, nervous and complaining of illness. She was restless during the night; she would wake up, and would complain

of the injury she had received; she said it hurt, and I would rub her down and try to get her relaxed, but it didn't seem to work all the time.

"Her condition didn't improve after the accident.

"I did most of the housework and we hired a colored girl to help but we couldn't afford to pay 20 or 25 dollars a week for help; and I can't afford to lay off from work and stay home and take care of the kids and do the housework and so forth. Finally, with the help of her sister, hiring a colored girl on weekends to do the ironing and general cleaning of the house and what I could do on my days off; that's all the way I could afford this colored girl to help us, would be one or two days a week.

"I spent at least 60 or 75 dollars for the colored girl.

"I can see a great deal of difference in Helen since the accident. She is extremely nervous, the least little thing, she is jumpy, and she goes off in a room by herself and lays down and relaxes and quiets down; she is upset and worried. She is just not the same person she was before."

The record shows that the appellees, at request of appellant's counsel, voluntarily agreed to allow Dr. J. C. Crager, of Beaumont, to examine appellee Helen Gauthier. Dr. Crager was called as a witness by appellant, and testified as a medical expert, his qualifications being admitted.

In substance, Dr. Crager testified that he had examined Mrs. Helen Gauthier on June 6, 1955, pursuant to a letter from appellees' counsel, Mr. Keith, and that he furnished counsel a copy of his report; that she gave him a history of having had surgery to her breast and a non-malignant lump removed; that some six weeks later she was leaving the Weingarten store on Gilham Circle, in Port Arthur, when the door suddenly swung shut and struck her right breast and shoulder, and that her right breast started stinging and burning; that at the time of his examination she complained of being extremely nervous, pain in the right breast and a poor grip in her right hand.

He explained the difference between subjective symptoms and objective symptoms, the former being something a patient relates, without there being necessarily any evidence to account for it, and the latter being something that can be observed and seen by the doctor and then related that he gave her a complete physical examination with the exception of the pelvic organs, as she had no complaint of that nature; that her head, neck, chest, abdomen, shoulder and arms, of which she complained, were examined, both physically and with the fluoroscope; the blood pressure, temperature and pulse were all entirely normal, the chest, heart and lungs normal; enlarged tonsils, but she said she had no trouble with them.

He testified that:

"A. The right breast showed a well healed scar in the outer portion, where an operation must have been done sometime prior—a very successful operation and well healed, and with very little loss of breast tissue. The patient complained of pain and tenderness when I would press over the outer muscles in the upper part of the chest, in the area near the shoulder. She could move the arm freely, easily, without pain, but complained of a loss of strength in her hand when she tried to grip tightly. She also complained of some pain at the back of the shoulder and loss of strength in the area. She said the muscle was weak. On appearance that was normal, and there was no evidence of atrophy from loss of use.

"Q. Did you find anything whatsoever to account for any loss of

strength in her hand or any complaint of not being able to use the arm and shoulder in a normal way? A. There was no finding of that.

"Q. With reference to the examination of the breast, if I understood you correctly, you said the operation had been done and excellent results had been obtained? A. Yes.

"Q. The scar—that is, the surgical scar where the incision was made, was well healed, is that right? A. That's right.

"Q. There was no scar tissue or anything like that to cause any difficulty or any trouble? A. That's right.

"Q. Did you say the substance of the tissue was good? A. Yes; the breast was quite normal otherwise, except the scar in the skin.

"Q. But as far as the blood vessels and other tissues that make up the breast, they appear to be perfectly normal and of good substance? A. That's right.

"Q. What you would expect to find in a normal breast that had not had any surgery? A. Yes.

"Q. I believe you said there was no finding to account for any lack of grip of the right hand. A. That's right."

His direct examination was concluded with the following:

"Q. Doctor, the evidence in this case shows that this lady was employed principally as a housewife; she was the mother of two small chidren. She and her husband maintain a home in Port Arthur, where she did housework. I believe the evidence shows she did some amount of outside work. She also related that after this door closed on her she had a bluish discoloration around the area of the right shoulder and the area of the breast which I believe she described at as brownish. Assuming all that to be true, that the door did come in contact with her, that there was no bleeding, but she did have some discoloration there, would you say in your opinion the condition has long since cleared up, based on your examination and findings? A. Yes; there is no remaining evidence.

"Q. Based on your examination, as set forth in your report, as well as your experience as a diagnostician, did you see any reason why that lady couldn't perform substantially all of the normal duties of housework? A. No finding to indicate that she couldn't.

"Q. Do you feel that whatever injury she might have got, assuming that the incident did occur as she related, and she did have these purple discolorations for a period of time, and had some discomfort, it is your opinion that she has recovered from the effects of the incident? A. That's right."

On cross-examination, Dr. Crager admitted that Mrs. Gauthier was jumpy and nervous, but he could see no reason for it and he further testified:

"Q. I want you to assume that this woman, prior to the time of this accident in September, 1955, that other than this surgical operation you found on her breast, which you believe was a successful operation from all appearances, that other than that she was a perfectly normal woman, the mother of two children who were born normally; that she not of a nervous disposition, but was completely settled and normal, mentally and emotionally and that immediately following this blow she developed the extreme nervousness such as you observed upon your examination. Now, doctor, you don't tell this jury that there is no causal connection between that blow that she received on the breast, and her nervous condition now, do you? A. I can find no causal connection.

"Q. But you do not deny that there is one? A. There are lots of in-

stances of nervousness following an injury, particularly when there is a lawsuit involved.

"Q. That is to say, there is a possibility, that the injury is the cause of her nervous condition now? A. Plus the present set-up, of the litigation and trial and things of that sort, because we have seen these things so often, when they are nervous here in the Court, possibly because of the amount of money involved; and when that thing is settled, one way or the other, they settle down and the thing is over with. So there is a definite causal relationship between the Court set-up and this thing in many, many cases.

"Q. In other words, you think— A. In most honest instances.

"Q. They hurt just as bad, or think they hurt just as bad as if there was something organically wrong? A. They may think they have quite a few things they have been encouraged to think they have; it is a difficult thing for them not to be nervous under the circumstances.

"Q. It is your testimony, from your one examination, that as soon as this trial is over she will be all right? A. It is my testimony that the type of injury of which she complained is not enough to produce a lasting nervous condition.

"Q. She has had it nine months. A. It will stop in due time."

On re-direct he testified:

"Q. I believe you told Mr. Keith that based on your experience, and having examined many people, any time there is litigation pending that generally is calculated to cause a condition of nervousness and tension in the person while the litigation is pending? A. It is very normal and very common.

"Q. Is that a condition that usually, once the litigation is terminated one way or the other, by trial or some other final disposition, when it is finally over with, they recover from nervous tension? A. In reasonably quick time.

"Q. And as far as the physical injury is concerned, based on your examination, the injury was not of sufficient severity to produce any condition of nervousness by itself that would have lasted any length of time? A. That's right."

■■ Such was all the testimony relating to the injury, and the damagee resulting therefrom, to appellees. We are not unmindful of the fact that this Court should proceed with caution in substituting its judgment on the question of damages for that of a duly selected and impaneled jury, untainted by any proof of bias or prejudice, unless the verdict is clearly so excessive as to be unsupported by the evidence. The jury in this case, as reflected by Special Issue No. 10 as above set out, was authorized to consider only the following: (1) Physical and mental pain sustained by Helen Gauthier up to the time of trial and physical and mental pain which she in reasonable probability would suffer in the future; (2) pecuniary value of her diminished capacity and service as a housewife in the past and up to the time of this trial, and it is to be noted, 13 Tex.Jur., Sec. 282, p. 473, that the plaintiff has the right to have the probable future consequences of the injury placed in evidence before the jury for their consideration in fixing the amount of damages. It is not sufficient to show that such consequences may occur; the evidence must show a reasonable probability of the occurrence of future ill effects of the injury.

In our discussion under appellant's points 8 and 9, supra, we quoted from the Supreme Court's holding in Meyer v. Great American Indemnity Company, supra, the rule that where a litigant subjected himself to a physical examination by a physician, under the facts there existing, that his

failure to call such physician as a witness in the course of trial was a proper subject of comment before the jury by the opposing counsel. The Galveston Court of Civil Appeals in that case had previously rendered its opinion that [272 S.W.2d 569, 571]: "It is to be presumed that, where defendant sent plaintiff to a doctor for examination, the defendant would have introduced such doctor's testimony if the same would have been favorable to it. And plaintiff's counsel is entitled to comment on the failure to produce the testimony of such doctor in argument to the jury."

We are of the opinion that such presumption yet obtains, as it did in the trial court, in this court's consideration of the excessiveness of the damages awarded in this case. In other words, we are convinced that appellees' failure to call the doctors of her own selection, in support of her testimony, was due to the likelihood that such testimony would have been unfavorable to their cause, and considering such failure, with the foregoing testimony, it would be superfluous by elaborate analysis to ascribe all reasons why the evidence does not support the award of the jury. As under the doctrine of res ipsa loquitur, the "circumstances in proof" relative to these last points, speak for themselves.

■ We have arrived at the foregoing conclusions regarding the excessiveness of the verdict in the belief that where under all the facts and circumstances of a case, the minds of men of average judicial experience can arrive at no other conclusion than that the award of damages is manifestly unjust, a remittitur should be required, the difficulties arising in the determination of the proper amount to be remitted. In such circumstances of indecision, as there must necessarily be, the party receiving the verdict and judgment of the trial court should be given the benefit of the doubt. Therefore, giving appellees the benefit of the doubt, probably in the amount of two or three thousand dollars,

we suggest that the appellees file a remittitur of five thousand dollars on or before the 6th day of August, 1957, and the judgment of the trial court will be reformed and affirmed accordingly. Otherwise, the judgment will be reversed and the cause remanded for a new trial.