MILDRED L. AULTMAN ET VIR V.
DALLAS RAILWAY & TERMINAL COMPANY.

No. A-3997. Decided June 30, 1953.
Rehearing overruled October 7, 1953.
(260 S.W. 2d Series 596)

510

*Irwin and Irwin* and *George W. Irwin,* of Dallas. for petitioners.

Since under all the evidence in the case the argument was a fair comment upon, and was made in direct response and reply to, certain testimony and inferences of the opposing counsel, as a witness in the case, it was error for the Court of Civil Appeals to hold that the trial court should have sustained respondent's objected to such argument. Corn v. Crosby County Cattle Co., 25 S.W. 2d 290; Airline Motor Coaches v. Green, 217 S.W. 2d 70; City of Waco v. Killen, 59 S.W. 2d 940.

*Burford, Ryburn, Hincks & Ford* and *Bruce Graham,* all of

Dallas, for respondent, Railway Company, and *Charles R. Long* of Dallas, for Packer Corporation.

On the contention that the argument was improper cited Morgan v. Maunders, 31 S.W. 2d 791; Indemnity Ins. Co. v. Harris, 53 S.W. 2d 631; Safeway Stores v. Brigance, 118 S. W. 2d 812.

MR. JUSTICE CALVERT delivered the opinion of the Court.

Mildred L. Aultman and husband, petitioners, sued Dallas Railway & Terminal Company, respondent, and Packer Corporation for damages for personal injuries sustained by Mrs. Aultman while a passenger on respondent's bus when it collided with the rear end of a truck belonging to Packer Corporation. Following a jury verdict on special issues the trial court awarded the Aultmans a money judgment against respondent and ordered that no recovery be had against Packer Corporation.

Only two questions were raised in the Court of Civil Appeals. One was alleged improper argument made to the jury by Mrs. Aultman's counsel; the other was that the trial court abused his discretion in limiting the time for jury argument. The Court of Civil Appeals held that the argument was such as to require that the judgment be reversed and the cause remanded. It also sustained the point relating to limiting time for argument, after observing that the point "will not be present on a new trial." 253 S. W. 2d., 900.

Both questions are here, although the application was granted on that of improper argument.

Respondent's bus ran into the rear end of the truck when the latter was stopping at a changing traffic signal light. Mrs. Aultman was thrown from her seat and suffered injuries, because of which she was taken by ambulance to a hospital, where she remained for eight days. She then went to the home of her husband's mother, who took care of her for about three weeks. After that she went to her own home where a sister stayed with her "for a while".

Upon her arrival at the hospital and while she was being held in the emergency ward, Mrs. Aultman was X-rayed by Dr. Sandridge, who then called Dr. Loiselle, a specialist in back injuries. The latter made an examination, took "several more X-rays and then a needle test." He saw her several times, "almost

every day" while she remained in the hospital, treating her, principally by prescribing exercises, and taking more X-rays. After she left the hospital, Mrs. Aultman went to Dr. Loiselle's private office three or four times. On the second of these visits he again took some X-rays; on the third visit he compared these X-rays with those previously taken at the hospital. For these services Dr. Loiselle tendered his bill for "$92.00 or $92.50."

Dr. M. D. Fry, who had attended Mrs. Aultman at the birth of her first child three or four years before the happenings involved here, testified that several weeks before the collision Mrs. Aultman came to his office to determine whether she was pregnant; that he did examine her and concluded that she was pregnant; that she was then in good physical condition. While she was in the hospital following her injuries Dr. Fry went to see her in response to a call from some hospital doctor. He swore she was complaining of pain in her back and abdomen and some light contractions; that he saw her twice more at the hospital and found her symptoms somewhat better; that she came to see him at his office one time after leaving the hospital, on which occasion he found her about three and one-half months pregnant; that on May 1 in another hospital he delivered her of a dead foetus. On the basis of what he saw in Mrs. Aultman's condition and a hypothetical question embracing the substantial facts of the collision as petitioners claimed they were, Dr. Fry expressed the opinion that the injuries sustained by her in the collision caused the miscarriage.

The argument question arose out of the testimony of Dr. Ruth Jackson, as a witness for Mrs. Aultman. It appears that she saw Mrs. Aultman only once, which was on April 10, when she made an orthopedic examination of Mrs. Aultman, some 6 or 7 weeks after the latter's injuries were sustained. In that process she took X-rays, examined some made by Dr. Loiselle and discussed the case with the latter. The effect of her testimony was that Mrs. Aultman had received serious injuries, particularly to her back; that an operation on her spine would probably restore her back to 80 or 85 per cent of its former normal condition, but that the operation would wholly disable Mrs. Aultman for about a year; that it was likely that she could never resume her former part-time professional dancing.

On cross-examination, respondent sought to show by Dr. Jackson that she had frequently appeared as an expert witness for plaintiffs in personal injury suits. In the course of that in-

quiry she was asked about having testified for a plaintiff several months previously in a certain case, and whether after being questioned along the same line she had become angry and cursed Bruce Graham, her questioner, who was of counsel for defendant in that case as he is in this, and had told Graham that she "was going to fix him". She positively denied having cursed Graham, but in answer to whether she had said to him that she was going to fix him, she replied: "No, I did not. I have no quarrel with Mr. Graham. I said I would get even with him some day, and I will." To the next question, which was "You are trying it right now, arent's you?" She answered "No, I am not."

So it was that Counsel Graham took the stand for his client, the respondent, and gave his version of what Dr. Jackson said and did as a witness in the trial of the other case. He swore that she became angry at his questions as to the amount she would be paid as a witness in that case; that after she left the stand she came near him and directed "blasphemous" language at him; and that she pointed her finger at him and said, "The next time I come to the courthouse and testify against you I am going to fix you up."

Graham did also testify, as urged by petitioners, "that Dr. Jackson's motives were not honorable". How this expression got into the record appears in the following excerpt from Graham's testimony on cross-examination by petitioners' counsel:

"Q. Do you think, in your own opinion, in your own mind, as you have testified about Dr. Jackson here, that's the only thing Dr. Jackson has in her mind when she comes to the courthouse to testify is money? Do you honestly think that? A. Do you want my opinion about it?

"Q. Yes. A. Based on what I know or what my information is, I have some serious doubts about her sincerity.

"Q. Thank you for your opinion. Now, I wish to ask you, do you think that Dr. Jackson, in this particular case, has no interest in this little woman right here than money? A. No, she has other interest than money. I think it is quite evident. Listen, I don't think the money in this case is the center of Dr. Jackson's interest.

"Q. Thank you. A. I will tell you, if you want to know what it is.

"Q. No, I appreciate your answer there, Mr. Graham. In

other words, you will agree with me that the interest of an attorney, that the interest of a doctor like Dr. Jackson, an interest in a client or patient is a normal thing and the money aspect isn't the only reason they wish to serve them. A. No, her interest, I don't think is honorable.

"Q. You don't think it is? A. No, I think it is just to do what she said she was going to do and that is to fix me."

During this same cross-examination petitioners' counsel asked Graham whether respondent had conducted "a personal examination of any kind of Mrs. Aultman". The reply was, "No, I am not permitted to. The law won't let us have an examination". Then he was asked whether he had read the deposition of Mrs. Aultman, "taken by your firm in our office", to which Graham replied "No". He further answered in reply to other questions from petitioners' counsel that he did not know that Mrs. Aultman gave specific permission in her deposition for respondent to make an examination of her. Thereupon came this colloquy:

"Q. If it was given and it is in here, your Claims Department had the right to go talk to those doctors, didn't they? A. Well, yes, and I don't know but what they have. But her doctors are not down here.

"Q. Dr. Jackson — A. Dr. Loiselle is not down here.

"Q. Dr. Loiselle is not down here? A. And we don't consider Dr. Ruth Jackson her doctor.

"Q. I don't care what you consider, Mr. Graham."

Later petitioners offered excerpts from Mrs. Aultman's deposition in which she said she had no objection to respondent "checking with Dr. Loiselle or Dr. Fry with reference to your condition", and that it would be "all right for either of the two defendants to see your record out at Parkland hospital."

So it came to pass, in that factual background, that Mrs. Aultman's counsel in his opening address to the jury made the argument complained of in respondent's two bills of exceptions.

The argument first objected to is emphasized in its proper setting in the following excerpt from the statement of petitioners' counsel:

"I am ashamed of Mr. Graham that he had to attack a woman

in the manner in which he had to attack Dr. Jackson here. He couldn't find anything against her, and you bet your life if he could have found one thing against her, he certainly would have brought it up here. But not one single thing. * * * You heard counsel get up on the stand and seek to imply that I am a plaintiff's lawyer and seeks to imply that Dr. Jackson is nothing but a plaintiff's doctor. He had to admit under oath that my firm has never faced him before. I never saw Dr. Jackson before. *And along that line, if there was one single thing untrue about Dr. Jackson's testimony, one iota of it, why didn't they bring up the doctor. Why didn't they bring somebody to refute what evidence there was that wasn't true? They had every opportunity in the world to do it and they haven't done it. Along the same line * * *."*

It was at this point that the following colloquy took place:

"Mr. Jensen: We object to him calling on absent testimony in support of his case. The burden of proof is on the plaintiff and the defendant has no duty to bring the parties here for him, and furthermore, there is no showing that there was any doctor that was in our control that we could have brought here to refute Dr. Jackson's testimony.

"Mr. Graham: Your Honor, it little behooves him to criticize us, when he hasn't even brought Dr. Loiselle, their own doctor, down here.

"The Court: I overrule the objection.

"Mr. Jensen: We except."

Somewhere further in the course of his argument petitioners' counsel continued:

"Gentlemen, as I said awhile ago, if there was anything wrong with Dr. Jackson they would have brought it out. * * * She testified to the best of her memory that she talked it over with Dr. Loiselle. And Dr. Loiselle is the resident physician out there at Parkland hospital. She is not trying to cover up anything. She is just a woman who is well qualified * * *."

Here counsel reviewed Dr. Jackson's qualifications and her testimony that to correct the petitioner's condition would require a major operation costing $750.00, hospitalization costing $90.00 to $100.00, blood transfusions costing $80.00, nursing costing from $124.00 to $244.00 and X-rays costing $45.00, and continued:

"You heard all the testimony of that doctor. They sought to infer that she was not competent, but they did not come forth with any evidence that she was not competent. And they did not come forth with Dr. Loiselle to show that his findings were different from hers."

It was at this point that counsel objected to the argument because "Dr. Loiselle was under their control, he was their doctor. We had no control over him", which objection was overruled.

Before a judgment is reversed because of argument of counsel two things must appear: the argument must be improper, and it must be such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case.

Petitioners insist that comment by their counsel on the failure of defendants to produce Dr. Loiselle as a witness was not improper because the argument was invited by counsel for respondent when he by his testimony and his objection had twice theretofore criticized petitioners in the presence of the jury for failure to call the same witness. We find it unnecessary to decide this question for, in any event, we do not think the nature of the argument was such as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. The rule applied by the Court of Civil Appeals that a reversal should occur unless the court can say that the argument had no effect on the verdict has not been the controlling rule since the adoption of Rules 434 and 503, Texas Rules of Civil Procedure. Cases decided prior to the adoption of the Rules have little value as precedents because they were decided under a rule which required a reversal if the court entertained any doubt of the harmful effect of the argument.

"Probably" is defined in the dictionary as meaning "in a probable manner". "Probable" is said to mean "having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt; likely". In the light of the whole record we cannot say that there is more reason than not to believe that the jury's verdict for the petitioners was caused by the possible inference, to be drawn from the argument, that if Dr. Loiselle were present he would support Dr. Jackson's testimony. In the light of the fact that respondent's counsel had twice criticized petitioners for not calling

Dr. Loiselle, it seems more than likely that the jury concluded that he would not testify for either party, else he would have been called by the one or the other; and it therefore seems that the argument probably had no influence on the verdict, either one way or the other. At least we have no reason for saying that the inference to be drawn from the argument outweighed the similar inference to be drawn from the testimony and objection of respondent's counsel and that it therefore probably caused the jury to return a verdict for plaintiff.

Moreover, neither the testimony of Dr. Jackson nor that of Dr. Loiselle could have any bearing on the issues of liability which were found in favor of the petitioners. If the argument made and the inference drawn by respondent therefrom could have influenced any part of the verdict it could only have influenced the amount of damages awarded. Excluding the testimony of Dr. Jackson altogether, the testimony of the plaintiff and of Dr. Fry would offer ample support for the damages awarded.

■ The trial court allowed plaintiffs' counsel fifty minutes to open and close the argument before the jury and allowed counsel for each of the defendants thirty minutes to present his argument. The defendants were seeking indemnity and contribution from each other but they were making common cause against the plaintiffs. The trial judge is allowed wide discretion in fixing the time to be allowed for argument. We cannot say that there was an abuse of that discretion in this case.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered June 30, 1953.

Rehearing overruled October 7, 1953.