LUMBERMEN'S LLOYDS V. CORA AND CECIL LOPER

No. A-4579. Decided June 23, 1954.
Rehearing overruled July 21, 1954.
(269 S.W. 2d Series 367)

*T. Gilbert Adams,* of. Jasper, *Collins, Garrison, Renfrow & Zeleskey* and *Henry H. Rogers,* all of Lufkin, for petitioner.

The Court of Civil Appeals erred in holding that defendant's counsel committed reversible error in arguing that the doctor changed his testimony because of a letter from one of plaintiffs' attorneys although such argument was supported by the record, and in reversing the judgment and remanding the cause because of the closing argument of defendant's counsel which made reference to one of the doctors, when plaintiffs made no objection thereto until their motion for new trial was filed, as any harm caused thereby could have been easily cured by an instruction from the bench. Wade v. Texas Emp. Ins. Assn. 150 Texas 557, 244 S.W. 2d 197, 200; Ramirez v. Acker, 134 Texas 647, 138 S.W. 2d 1054; Airline Motor Coaches v. Campbell, 184 S.W. 2d 532, error refused w.o.m.

*Favor & Barnes* and *Clyde E. Barnes,* of Jasper, for respondents.

In reply cited Coleman v. Miller, 29 S.W. 2d 991; Robbins v. Wynne, 44 S.W. 2d 946; Morrison v. Smith, 138 S.W. 280.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The assignments of error in this workmen's compensation suit add yet again to our lengthening list of improper argument cases, which, because of the reticence of trial judges, lack of self-restraint on the part of lawyers, or some other cause, increasingly burden an already heavy docket of personal injury claims.

The argument in question was made by counsel for the defendant insurance carrier (petitioner here) and caused an otherwise amply justifiable verdict and trial court judgment in its favor to be set aside in an elaborate opinion of the Beaumont Court of Civil Appeals, followed by two opinions on first and second motions for rehearing respectively. 269 S.W. 2d 353.

The claimant, Loper, (succeeded on his death by the respondents, his widow and child) was at the time of his alleged injury on February 9, 1951, a man of some seventy-two years, drawing old age benefits from the government and afflicted with a very recently, though slightly, perforated duodenal ulcer in addition to some abnormality of the heart and hardening of the arteries.

The claim was that this ulcer (the mentioned perforation from which had apparently closed at the time of the alleged injury) was torn into a large perforation by a blow from a piece of timber which allegedly struck the claimant in this area of his abdomen, while he was working at Bon Wier, Newton County, as one of a sawmill crew of his employer, Bon Wier Lumber Company, which had hired him only a few days previously. On February 11, 1951, the perforation was patched in an operation at John Sealy Hospital at Galveston, to which the claimant had been referred as a charity patient by Dr. Whitecloud of Newton, the physician to whom the employer sent the claimant a few hours after the time of the alleged accident; but after lingering about three months, the claimant died, evidently because of peritonitis resulting from the perforation.

The sawmill crew mentioned consisted of six men, of whom three, including the claimant, had died before the trial. The apparatus which they were operating was, so far as we can tell from the record, some sixty-five or seventy feet in length but considerably less than that in width. Apparently the rough logs enter at one end and by means of a carriage are pushed against a circular saw located a few feet further along and in this process are sawed lengthwise, each log thus continuing along in the same direction it started, but being in more than one piece after passing the saw. Any useless slabs thus resulting are guided off to one side onto another conveyor just after leaving the saw, while the useful pieces continue straight along and eventually are cut by other saws into proper lengths at the end of the machine opposite that of original entry of the logs. At the log entry end is stationed one crewman, who gets the logs properly placed on the carriage. Following this man, at just a few feet distance is the "sawyer," who manages the saw and more or less oversees the whole operation. The saw itself is located slightly down the line of operation from the sawyer.

A few feet further along and to one side is the place occupied by the claimant, who is thus quite close to the sawyer and not over fifteen feet from the first man in the line. The claimant's duties seem to have consisted of watching the sawed timbers as they passed him and guiding the useless ones to the conveyer that carrier them away. For this purpose he stood in a little depression or pit close to and facing the machine.

Still further along the line of operations were the three remaining men, spaced at intervals and terminating with one Sandy Brooks, who had charge of cutting the timbers into par-

ticular lengths. Brooks stood about fifty feet away from the position of the claimant and on the opposite side of the machinery from the latter, but facing so that, if he looked sideways for the distance indicated, he could see the claimant.

The main fact issue on the evidence was, not whether the obviously unusual occurrence of an external blow causing an ulcerated intestine to be perforated was possible or probable, but whether the claimant suffered a blow at all, which the jury in effect found that he did not. The most emphasized portion of the offending argument dealt exclusively with the former, although an important part dealt also with the main question.

Undoubtedly the claimant at a moment shortly before noon on February 9th suddenly quit his post while the machine was in full operation, and by this and subsequent conduct and words gave evidence of some physical disturbance, though obviously he was not unconscious and left his place in part at least by his own efforts. Of the three members of the crew living at the time of the trial, the sawyer and the man at the log entry end of the machine, who were evidently in a better position than anyone else to see what happened, testified that the claimant simply stopped working and that no accident or injury occurred, while Sandy Brooks, who was in about the poorest position of all to observe, was the only witness from the crew or otherwise who supplied evidence to the contrary. As Brooks reluctantly admitted, after denying that he was "related to" the claimant, his wife was a second cousin of the respondent widow. It was also developed from him that he was, for many years, a neighbor, coworker and friend of the claimant and had actually gotten claimant the job at which he was working. He said that claimant, "learned me how to sawmill." He testified in effect that, at exactly eleven fifty-five A.M., the timber struck the claimant in the side, that claimant "throwed up his hands," dropped to his knees and (seemingly!) remained kneeling for at least several minutes thereafter, holding his side, until "the whistle blowed" for lunch, and the witness assisted him to a nearby room where he lay down and told the witness "that slab got him."

As against this latter alleged statement of the claimant, there was abundant and uncontradicted evidence that the claimant's body showed no signs whatever of being scratched or bruised, and both Dr. Whitecloud and the respondents' only medical witness, Dr. Edward B. Rowe, testified that claimant gave no history of an accident. There was also rather impressive evidence

from the mill manager and others of statements by the claimant very shortly after the accident to the effect that he was simply suffering from indigestion.

The only witnesses for the respondents were Sandy Brooks, the respondent widow and Dr. Rowe. The latter, an instructor in surgery at the Texas University Medical School at Galveston and resident surgeon at the University Branch of the John Sealy Hospital, interviewed and examined the claimant on February 11th., diagnosed his illness as an ulcer performation or rupture, operated on him that same evening and attended him thereafter until he left the hospital on March 24, 1951. Thereafter he saw the claimant on April 21, when the latter returned to the hospital and again on May 11, the day before he died there. This physician testified merely that, *assuming the claimant to have been struck by the slab* as described by Brooks *and further assuming the claimant to have been a robust workman untroubled in his work by the ulcer up until that time,* the cause of claimant's illness and death was in *reasonable probability* the blow from the slab.

On direct examination, the doctor quite definitely confined his answers to the questions as put. For example he stated that he took the claimant's history of his trouble, but failed to state that, neither then nor at any time until shortly before the trial some two years thereafter, had he ever heard or observed anything suggesting the claimant to have been involved in an accident; nor did he elaborate on his answers enough to disclose his own conclusion, evidently reached long prior to his knowledge of the lawsuit, that the ulcer had once perforated the intestine just a few days prior to the date of the alleged accident, according to what the claimant had told him about previous pains in the abdomen; nor did he find occasion voluntarily to disclose that, to his knowledge, the claimant, while strong in muscle for an old man, had yet detectable hardening of the arteries and certain defects of the heart itself. All this developed on cross examination after petitioner's counsel got permission from the witness to review the file to which he was referring during his direct testimony. Counsel thus cross-examined the doctor also about certain correspondence (not copied in the record) between the witness and counsel for the respondents. It thereby developed: that when the witness first wrote counsel for respondents his opinion about the relation between the assumed accident and the death of the claimant, he had stated that the former was a "possible" cause of the latter; that thereafter counsel had disclosed to the witness his financial interest in the case, supplied him with state-

ments of some prospective witnesses, and in the same letter explained that it was legally necessary for the respondents to have reputable medical evidence that the causal relationship in question was one of reasonable probability as distinguished from mere possibility; and that, in reply to this latter communication, the witness had committed himself to a reasonable probability. It was also brought out that the witness had been accompanied from Galveston as far as the nearby city of Jasper by a Dr. Humphreys, a medical resident of the University Branch of John Sealy Hospital, who was familiar with the autopsy there performed on the claimant in May 1951, and who the witness understood was to testify in the case. Dr. Humphreys evidently never appeared, and there is nothing further in the record about him except a portion of the offending argument drawing inferences from his absence unfavorable to the respondents' case.

The most criticized portion of the argument in question was that wherein Mr. Renfrow, for the petitioner, on the strength of the above-mentioned correspondence, in effect accused counsel for the respondents of suborning false testimony on the part of Dr. Rowe for a sum of money, the doctor's sworn opinion abovementioned not being his true opinion. While neither this nor, indeed, any part of the entire argument was objected to, except the above-mentioned reference to Dr. Humphreys, and while the accusation was not in the most positive or provocative words of which language is capable, the import was quite plain and in our judgment was so unfair a deduction from what the record of the correspondence in question discloses, that under other circumstances it might be reversible error. So far as the record shows, the change in the doctor's letters from "possible" to "reasonably probable" could quite as well have been due to altogether innocent causes. Why should not a lawyer—on either side of the docket—be free to tell a physician what the legal test in question is, in order that he may know whether the honest opinion of the latter is for or against his client? And why might not honorable counsel advise a physician of his own interest in the case for the purpose of being perfectly frank about counsel's own possible prejudice in the matter?

Equally questionable is the argument stating in effect, and quite plainly, that counsel for the respondents by improper means procured false testimony from Sandy Brooks. Such testimony was, indeed, not very convincing under the circumstances, but there was not a line of evidence of improper conduct of counsel in the premises.

The accusation that counsel for the respondents in particular, and attorneys for personal injury claimants in general, conspicuously and deliberately count upon and seek to arouse prejudice on the part of the jury, was, of course, quite unsupported by the record, although the opening remarks of respondents' counsel proclaiming his desire for fairness to both sides were supererogatory and thus open to some retort, if considerably milder than the one made.

The comment on the absence of Dr. Humphreys presents a close question, but, as will appear, we need not discuss it.

For the purposes of decision, we assume that all of the argument in question was improper and of the type that ordinarily is "incurable" by admonition from the bench. At the same time we must heed the rule (Rules 434 and 503, Texas R. Civ. Proc.) last applied by us to the matter of jury argument in Aultman v. Dallas Railway & Terminal Co., 152 Texas 509, 260 S.W. 2d 596, 599, that the error, to be reversible error, must be one that "probably did cause the rendition of an improper judgment in the case." In the Aultman decision, we determined this question "In the light of the whole record," 152 Texas 509, 516, 260 S.W. 2d 596, 600. The "whole record" clearly includes the statement of facts, and there is small point in looking to the latter, if we are to ignore the most essential thing which it discloses, to wit, the state of the evidence. If the evidence is such that we believe the jury would in all probability have rendered the same verdict that was rendered here, whatever the argument of the defendant's counsel or lack of it, how can we logically say that the argument probably caused the rendition of an improper judgment based on that verdict? It is true that the rule in question cannot in every type of case be given the broad application which its words literally invoke. For example, in a case of an incorrect submission to the jury, we could hardly by-pass the error by making, in a sense, a decision on the weight of the evidence. Even in improper argument cases, we should doubtless consider the state of the evidence with much caution. But, with some slight apology to consistency, we think that in argument cases we may properly reason, as we do in this case, that since the evidence so preponderated in favor of the finding that the alleged accident did not occur, and since the worst of the offending argument had no direct reference to that specific matter, the argument probably did not cause the verdict and judgment to be as they were.

In reaching our conclusion about the evidence, we have, needless to say, carefully examined the testimony, our analysis of

which is generally indicated in the earlier part of this opinion. To lengthen the latter further by additional discussion would serve no great purpose. We believe that any fair jury would have reached the same verdict regardless of the argument of counsel for the petitioners.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

Opinion delivered June 23, 1954.

Rehearing overruled July 21, 1954.