**STATE of Texas et al., Appellants,**

**v.**

**O. E. LOESSIN, Jr., et ux., Appellees.**

**No. 10816.**

Court of Civil Appeals of Texas.

Austin.

Feb. 8, 1961.

Rehearing Denied March 1, 1961.

Will Wilson, Atty. Gen., H. Grady Chandler, Joseph G. Rollins, L. P. Lollar, Asst. Attys. Gen., W. S. Lott, Georgetown, Special Counsel, for appellant.

Fox & Fondren, Barkley & Cutcher, Taylor, for appellees.

HUGHES, Justice.

This suit was brought by O. E. Loessin, Jr. and wife Elizabeth Loessin, against the State of Texas and the Texas Highway Commission under the permission granted by the Legislature in S.C.R. No. I, 2nd Called Session, 55th Leg. p. 197 (1957).

The only issue submitted to the jury, other than issues as to value was:

"Do you find from a preponderance of the evidence that the property of the plaintiffs was damaged by reason of the construction of the embankment in question on State Highway 29?"

This embankment was completed about October 1, 1957.

Since the legislative resolution, supra, recited that the construction of the embankment (Highway 29) constituted "a taking" of appellees' land, and since the authority conferred thereby to sue for money for the "taking" of such land; we entertained some doubt that legislative permission had been granted to sue for damages to appellees' lands which, concededly, were not "taken".

■ We have concluded to resolve this doubt against the State for the reason that the resolution of the Legislature, construed in its entirety, is fairly indicative of the legislative intention to allow appellees to sue for all monetary damages caused their land by the construction of the embankment on Highway 29. State v. Hale, 136 Tex. 29, 146 S.W.2d 731.

The above special issue having been answered in the affirmative, and the jury having assessed damages in the sum of $20,000, judgment therefor was accordingly rendered for appellees.

■ Appellants' first point is that the Trial Court erred in not instructing a verdict for them on the ground that the uncontroverted evidence shows that they have not damaged or taken any of appellees' land by construction of the Highway 29 embankment, such evidence showing that such land would have been flooded and covered as a result of the October, 1959, flood, "regard-

less of whether the Highway 29 embankment had been constructed."

For a better understanding of the facts, we insert a sketch map of the area in suit:

After quoting extensively from the testimony of witnesses for appellees, appellants summarize the following undisputed facts derived from such testimony.

"(1) That the flood waters from the San Gabriel River came up higher on Appellees' property in 1921 and 1957, before the embankment on Highway 29

was built, than from the flood waters of the river in October, 1959, after it was built.

"(2) That Appellees suffered greater injury and damage. to their property from the flood of 1957 (before the embankment on 29) than from the flood of 1959 (after the embankment on 29).
* * *

"(3) That Appellees' property would have been covered with water from the 1959 flood even if the embankment on 29 had not been constructed.

"(4) That the flood waters from the river from the two last floods, 1957 (before the embankment on 29) and 1959 (after the embankment on 29), spread out over and across the highway at least one-half mile up stream from Appellees' property and entered the flood plain of which Pecan Creek was a part which lies north of Appellees' property."

We agree that such facts are undisputed. We do not agree that they conclusively establish the nonexistence of damage caused by the construction of the Highway 29 embankment.

The simple answer to the contention of no evidence is that the 1957 and 1959 floods were floods of different volumes. Much more water came down the San Gabriel in 1957 than in 1959. The evidence is that while water would have covered appellees' property in 1959, even though the embankment on Highway 29 had not been constructed, the depth of such coverage would have been much less than it actually was.

We will not review all the evidence in disposing of this point, but will merely refer to portions of it, sufficient in our opinion, to demonstrate that this point is not well taken.

Henry Matysek, Sheriff of Williamson County, testified that the San Gabriel River runs through Georgetown on two and one half miles to Mankin's Crossing where

Marshall's Grocery is located, then on eight miles to Circleville where appellees' property is located; that a bridge crosses the San Gabriel at Marshall's Grocery, and that there are no creeks running into the river between Marshall's Grocery and the bridge located near the property of appellees.

Sheriff Matysek was at Marshall's Grocery during the 1957 flood and the water was eight feet deep, the high water mark, in the Grocery at such time. The highest point reached by the water in the 1959 flood at Marshall's Grocery was eight inches, the Sheriff testified.

Mr. John Vandertulip, a consulting hydraulic engineer, testified that the peak discharge of the San Gabriel at Georgetown during the 1957 flood was 155,000 cubic feet per second and that the peak discharge of the river at Georgetown during the 1959 flood was 72,000 cubic feet per second.

Mr. Vandertulip testified that the embankment on Highway 29 at its highest point where it joined Highway 95 was 18 feet above ground level, and that this height continued for about 100 feet West of Highway 95 and then sloped 700 feet to a height of 1½ feet to 2 feet on the West end. He further testified to the dimensions of the bridge across the San Gabriel at Marshall's Grocery and near appellees' land as well as to the dimensions of the bridge across Pecan Creek, just north of the San Gabriel bridge on Highway 95. The Pecan Creek bridge was described as a relief bridge for the Highway 95 San Gabriel bridge, and was much larger than the river bridge.

Although the difference in the height of the water in Marshall's Grocery in the 1957 and 1959 floods was about 7 feet, the difference in the depth of the water on appellees' land in these floods was only 2.5 feet. Mr. Vandertulip attributed this fact to the construction of the embankment on Highway 29. We quote from his testimony:

"Q. Now, Mr. Vandertulip, tell the jury just what, in your opinion, as a

hydraulics engineer, that dump on Highway 29 does and will do and has done to the flow of flood waters in that area, and especially, the Loessin property. A. Well, there are two effects from the Highway 29 dump. The sloping section cuts off an appreciable area that the flood waters would normally go through; so the dump has reduced the area that the flood waters can go through, and thereby, decreased the amount of flood waters that can go over to Pecan Creek. The other effect is the raising of the roadway, the 700-foot section of Highway 29 one and a half to two feet above the ground surface, and this acts as a type of dike—the water has to go higher in order to go over it—and the net result of the embankment, the raised sloping section and the 700-foot level section, is that the Loessin property would have more flood water on it in any given flood, because the water would have to be raised to go over this Highway 29 embankment.

\* \* \* \* \* \*

"Q. Now, can you tell me from your observations out there, how much deeper it was on the Loessin property in the flood in 1959 on October 4, than it was north of the Loessin property across Highway 29? A. Across Highway 29?

"Q. Yes. A. There was—the water marks indicated that it was probably the order of one and a half feet higher on the Loessin property than it was on the Pecan Creek side of Highway 29.

"Q. All right, sir. Now, how much higher was it on the Loessin property than it was on the downstream side or the east side of Highway 95? A. About two and a half feet difference in water levels between the upstream and downstream side of the Highway 95 embankment.

\* \* \* \* \* \*

"Q. \* \* \* Will you tell us really what the technical significance of the Highway 29 embankment is, concerning the flow there and the currents? A. Well, after the initial flood crest hits, the flow will be across the property and be deflected by this raised section of Highway 29, and cause a whirlpool effect. Now the flow coming here will be deflected; it can't get through, so it is forced back to the river. The river in the main channel section is going through the bridge at a fairly high velocity, and it almost acts as a wall. The slower-moving water here cannot get into the fast moving current too well; so it is again deflected, and it causes a whirlpool effect. When you first have a flood crest come down, it may pile up against the embankment and cause a swirling in the opposite direction; but as the flow tends to stabilize, it will have a normal circular movement in a clockwise direction.

\* \* \* \* \* \*

"Q. Now, I want to ask you, Mr. Vandertulip, based upon your experience, your knowledge, your training, and your observations that you have made in preparing your report on this property, if the water in 1957 was approximately 7 feet higher at Marshall's grocery on the San Gabriel River than the water was on October 4, 1959, why would there be such a small difference in the water level on the Loessin property as between those two floods. A. Well, there are two things. One is the natural effect of river valley storage between Marshall's grocery and Circleville. The other is—and probably the most important—the ponding effect caused by the highway embankment of Highway 95.

"Q. Of Highway 95? A. And also —Highway 95 for 1957, and then Highway 95 and Highway 29 combined for 1959.

"Q. In other words, then, the—of course, the embankment on Highway 95 was there both times? A. Right.

"Q. Then the material difference would have been, as I understand it, caused, then, by the embankment on Highway 29? A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. Now, can you tell us the difference there, after you have looked at your report, the difference in the down-water high point mark in the 1957 and '59 floods? A. Well, the difference between the upstream and downstream elevations of the water surface of Highway 95 was 2.6 feet in 1957—this was by the United States Geological Survey data—and 2.5 feet when I checked it in 1959.

"Q. In other words, there was very little difference? A. Very little difference, that is correct.

"Q. All right, sir. Now, that is the west and east side of Highway 95? A. That's right; the upstream is the west side, and the downstream, the east side.

"Q. All right. How much difference in the magnitude of water that passed there, the discharge, was there? I believe you told me a while ago that the only figures you had were based upon discharge at Georgetown? A. The discharge in 1959 was much less than in 1957.

"Q. Then what was your conclusion concerning the increased depth of water on the Loessin place? A. With a much lower discharge, and still getting the same, or essentially the same difference between upstream and downstream water surfaces, the Highway 29 embankment which was constructed after the 1957 flood and before the 1959 flood caused the same amount of flooding, or the same depth of water, same difference in head loss, and this was because the Highway 29 embankment raised the water.

\*    \*    \*    \*    \*    \*

"Q. All right, sir. Now, what effect, if any, in your opinion does the Highway 29 dump have upon creating back water up the San Gabriel River, and how far would it do it? A. Well, the Highway 29 dump would obstruct the flow that was coming across from the San Gabriel River, and as such, would raise the water surface by ponding, and also this back water effect, which would extend upstream beyond the Loessin property.

\*    \*    \*    \*    \*    \*

"Q. All right, sir. Now, I will ask you once more to refer to Plaintiffs' Exhibit No. 1, which is this sketch here, and tell me prior to the time the 29 dump was in there, how much cross-sectional area did the Loessin property have for the discharge of water? A. Well, before the Highway 29 dump was in, you had the bridge opening on Highway 95 over the San Gabriel River, and after subtracting for the sloping abutments and the piers and piles underneath the bridge, you have approximately 7600 square feet of area under the bridge on the San Gabriel River, plus 11,350 square feet under the Pecan Creek bridge, a total of about 19,300 square feet available under the two bridges.

"Q. For the discharge of water off of the Loessin property? A. Discharge of water coming down the river, yes, sir.

"Q. All right. After the Highway 29 dump was put up there, how much cross-sectional area does the Loessin property have for the discharge of water? A. Well, you just have the 7600 square feet on the San Gabriel River until the water surface was raised up high enough over the Highway 29 fill to migrate over to Pecan Creek.

"Q. In other words, the dump on Highway 29, then, decreased the cross-sectional area that the Loessin property has for the discharge of water until it reaches a certain level? A. Yes, sir."

From a purely evidentiary point of view, it is our opinion that the damaging effect of the construction and maintenance of the Highway 29 embankment in flood time is competently and firmly established.

Appellants' points two through five relate to alleged improper jury argument by counsel for appellees. These points will be considered together.

We take the following from appellants' Bill of Exceptions No. I:

"Mr. James Cutcher, one of Plaintiffs' attorneys, in his closing argument to the jury, stated the following:

" 'Now we get down to questions Nos. 2 and 3 again here. Mr. Martin told you that he moved north not many months ago; he said he didn't have his notes here; but he has been in the real estate business—and remember this when you answer these two questions: The Court has told you that you must answer the questions on the evidence presented here to you. You can't reach up in the air and get a figure. It has to be based upon the testimony here.

" 'Now, the testimony of Mr. Martin is $34,000 before, $10,000 after. The testimony of Mr. Loessin is $30,000 before and $10,000 after. The testimony of Mr. Frederick is $9,375 both times.

" 'You have got to answer one of those figures; that is all that is in front of you. That is all that is in front of you. They brought in a bunch of stuff about these estates here, but they didn't bring those appraisers that appraised in those estate up here to you. So that testimony is not testimony that you can put in these figures right here, because that testimony is not before you as an actual figure.

" 'Remember the court hasn't asked you the value of the gin before and after. He hasn't asked you the value of the estate in 1956 and 1952—and by

the way, that one in 1952, they had it at $30,000—and still Mr. Loessin said, "My house was never included in either one of them."

" 'Gentlemen, on question No. 2 you must put one of three figures. That is the only evidence that you have.'

"After all the foregoing argument, one of the attorneys for the Defendants, the State of Texas and The Highway Commission, made the following objection:

" 'If the court please, I hate to keep interrupting counsel, but on that I am going to have to object that that is improper argument, that it is not a correct statement, that they have to take one of the three figures that have been presented here; that it is up to this jury, and following the court's instructions, to arrive at the market value. They do not have to take the testimony of any particular witness. I further request the court to instruct the jury not to consider it.'

"Following the foregoing argument and objection, the Court instructed the jury as follows:

" 'Gentlemen, you are the exclusive judges of the facts proved, of the credibility of the witnesses, and the weight to be given to their testimony; but you receive the law from the court, as set out in the charge. Proceed with the argument.'

"Following the foregoing instructions by the Court, Mr. James Cutcher proceeded with his argument as follows (to which no further objections was made):

" 'I ask you, what other witnesses testified to a before and after figure? You've got to believe one of them; that is the only evidence in front of you. The court has told you that you have got to come back here and find your answers on the testimony here in the

courtroom; and that is the only three witnesses who testified to it. So you've got to take one of them. You can take Mr. Martin; you can take Mr. Loessin; you can take Mr. Frederick. You can have Mr. Frederick on it. We don't want him.

" 'There were only two men that really testified in here that know anything about the property that gave you a before and after value; that is Mr. Loessin and Mr. Martin. When it boils right down to it, you fellows are going to have to decide which one of them you think is in a better position to give you the market value of this property.' "

This bill was qualified as follows:

"Both counsel for the defendants in their arguments to the jury, both such arguments being prior to the argument of Mr. Cutcher, had told the jury that the testimony of Mr. Frederick concerning the market value of the property was reliable testimony and that the jury could answer the Special Issues from the testimony of Mr. Frederick.

"During the trial, evidence was offered by the defendants, and admitted, showing the value of Oscar Loessin's Estate in 1952, and Martha Loessin's Estate in 1956, as well as certain instruments, such evidence being offered and admitted for the purpose of impeachment of Plaintiff, O. E. Loessin, Jr., and during his argument to the Jury, Mr. Lott, one of the Attorneys for the defendants, commented on the values of such Estates.

"During the trial testimony was offered by the defendants, and admitted, showing the separate market value of the cotton gin, and during their arguments to the jury both attorneys for the defendants commented on the separate value of the cotton gin."

The following is taken from appellants' Bill of Exception No. 2:

"Mr. James Cutcher, one of Plaintiffs' attorneys, in his closing argument to the jury, stated as follows:

" 'You have three men who have testified to the value before and after of his whole property: Mr. Martin, Mr. Loessin, and Mr. Frederick from Austin. Where is their Williamson County real estate man? Why couldn't they get one? They go up to Austin and get Mr. Frederick.'

"To the foregoing argument, one of the attorneys for the Defendants, the State of Texas and The State Highway Commission, made the following objection:

" 'For the record, I would like to object to that, our not getting a real estate man, for the reason that it has not been shown here that any such real estate men are under the control of the defendant where they could bring them in, and I request the court to instruct the jury not to consider that for any purpose.'

"Following objection and request of the Court to instruct the jury not to consider said argument for any purposes by Defendants' counsel, the only action of the Court upon said objection and request for instruction was as follows:

" 'The Court: Proceed with the argument.

" 'Mr. Lott: May I have a ruling on that, if the court please?

" 'The Court: You have already got it. Proceed with the argument.' "

The following is taken from appellants' Bill of Exception No. 3:

"Mr. James Cutcher, one of the attorneys for the Plaintiffs, in his closing argument to the jury, stated as follows:

" 'Where was he? If the State of Texas is going to spend your money by bringing Mr. Frederick over here, if

they are going to spend their money that way, gentlemen, something is wrong. But I don't want to ride on him too much. That young fellow has to make a living, just like the rest of us, and he will be testifying for some time * * *.'

"The foregoing argument by Mr. James Cutcher, Plaintiffs' attorney, was made immediately following Defendants' objection and the action of the Court with respect to Plaintiffs' argument in regard to Defendants not having a Williamson County real estate man to testify."

The following is taken from appellants' Bill of Exception No. 4:

"Mr. James Cutcher, one of Plaintiffs' attorneys, in his closing argument to the jury, stated the following:

" 'Now, they come along and say, oh, yes, he would have had it there anyway, because we've got the levees up here; he would have had it there, anyway. Well, yes, there is no way to get away from that. That is true. The 95 dump hurt the man. The 29 dump ruined him.

" 'What about Mr. Quebe: He said it was all running down here, and still rising in there. If they held one more inch of water on him longer than was necessary, he was damaged. I still say yes, the 95 dump hurt him; the 29 dump ruined him.' "

Regarding the argument and proceedings reflected by the first bill of exceptions, appellants say that such argument "is an incorrect statement of the law." In support of this contention we are cited to our own opinion in McCarty v. City of Amarillo, Tex.Civ.App., 307 S.W.2d 595, to the effect that opinion evidence as to market value is not conclusive, and that the jury may reject such opinion and form its own opinion from the evidence and by utilizing its own experience and matters of common knowledge. Under this authority, the argument of coun-

sel was erroneous. We are, however, concerned with the particular objection made and its validity under this record.

The objection, copied above, was that the argument "is not a correct statement" (the words "of the law" are omitted) and "that it is up to this jury, and following the court's instructions, to arrive at the market value."

Turning to the court's charge we find that it instructed the jury not to consider "any matter whatsoever that you know personally about the facts of the case, or that any of your fellows may know, or that may come to you in any way whatsoever other than under the directions and rulings of the Court. * * * You are further instructed that while you are deliberating upon your verdict, you will not mention, nor refer to, any matter, fact, or circumstance other than the evidence that has been produced in court, and the law as given you in the Charge of the Court, all of which I instruct you, you must strictly observe and obey."

It would be very difficult for a jury, under this charge, to believe that it could utilize its own experience and matters of common knowledge in answering the issues as to market values. That their deliberations were restricted to the opinions of value given by the various witnesses is plainly the meaning of the charge. Since the argument here complained of was consistent with this interpretation of the charge, and since the charge was not objected to, we are of the opinion that such argument does not present reversible error.

The argument complained of in bill of exception two, supra, is said to be in violation of the rule that "Argument of failure to produce a witness is not permissible where the witness is available to both parties alike, or is not available to either party." St. Paul Mercury Ins. Co. v. Jackman, Tex.Civ.App., Eastland, 331 S.W.2d 253, writ ref., N.R.E.

We do not believe this rule to be applicable here. The land to be appraised

was in Williamson County, and it would be arguable, at least, that residents of that county were best acquainted with its market value. Appellees called value witnesses from Williamson County. Appellants called no value witnesses from that county. We believe this failure was fairly the subject of jury argument.

Neither of the arguments set out in bills of exception three and four were objected to at the time.

As to bill number three there was nothing wrong with the State spending money to employ Mr. Jim Frederick to testify to market value. The State was a defendant and certainly was entitled to employ this witness. We feel sure the Trial Court would have so informed the jury or would have withdrawn this remark from the jury's consideration had he been requested to do so. Perhaps such request was not made because counsel knew the jury was too well informed to be influenced by such argument.

As to the argument in bill number four, the embankment along Highway 95 was established as a physical fact. In the very nature of things, it damaged appellees' land. This damage is shown by the testimony previously quoted. The damage issue was confined to damage caused by the Highway 29 embankment, and we presume the Court would so have instructed the jury had appellants thought such instruction worth requesting.

■ The argument that Highway 29 "ruined" appellees was not erroneous. "Ruined" is a relative term, and the jury, no doubt, understood its intended meaning in this case.

■ Applicable to all alleged improper jury argument, we have concluded that reversible error is not shown under Rule 434, Texas Rules of Civil Procedure. In reaching this conclusion we have considered the entire record in accordance with the test prescribed in Aultman v. Dallas Railway & Terminal Company, 152 Tex. 509, 260 S.W. 2d 596.

Points six and seven, presented jointly, are to the effect that appellee, Mr. Loessin, was not a qualified witness to the value of his property, and similarly, that appellees' value witness, J. B. Martin, was not qualified, and that his opinions as to value had no factual support.

Mr. Loessin, 52, testified that he had lived on the property since 1928, and had helped his father operate the gin located on the property since he was 20 years of age; also, that he built his home on the property in 1945. He stated that he knew the value of his land before and after the construction of the Highway 29 embankment.

■ In our opinion, Mr. Loessin, was a qualified witness to the value of his land, and his opinions of value were admissible. Panhandle Eastern Pipe Line Co. v. Jackson, Tex.Civ.App., Amarillo, 306 S.W.2d 145, no writ history.

■ Mr. Martin had been in the real estate business in Williamson County for about fifteen years and had sold "quite a bit" of property. He had known the Loessin property since 1900, and had recently inspected it. We think Mr. Martin was qualified to express an opinion as to the market value of the land in suit. We also are of the opinion that his conclusion as to value had sufficient factual support to have probative value.

Appellants, on these points, cite Tennessee Gas & Transmission Co. v. Zirjacks, Tex.Civ.App., San Antonio, 244 S.W.2d 837, writ dism. In that case the Court stated that it found no "specific testimony detailing in what ways the laying of the pipe line (30 feet in diameter) twenty-four inches under the surface across the property within the fifty-foot strip would affect the value of the land lying outside the fifty-foot strip," and, the Court continued, "One claiming damages to land must show the nature of the damage, the effect upon various portions of the tract and the relationship of the same to market value. A mere conclusion as to market value is insufficient for this purpose."

We fully agree with this statement of the law. There is no dearth of evidence here to the elements of damage suffered by the Loessin land. That real property is subject to flooding certainly has some relation to the market value. The two witnesses here gave no opinion as to whether or not the land had been damaged in the sense of sustaining physical loss. Their opinions were confined to the effect of this otherwise established loss upon market value.

Points eight and nine are to the effect that the damages assessed were excessive, and that the jury verdict as to damages is against the great weight and preponderance of the testimony.

Mr. Martin and Mr. Loessin both testified to values which support the jury verdict. Appellants only value witness testified that the value of the Loessin property was $9,375, both before and after the construction of the Highway 29 embankment.

Appellants do not, in arguing this point, rely upon the appraisal of its only witness as to value, rather they point to a sale of an interest in the property to Mr. Loessin from two of his brothers which indicate a full value of $7,200, and to testimony that the business of cotton ginning is declining.

The evidence shows that Mr. Loessin had worked for and helped his father for 20 years, and had paid his father's debts on the gin and built a house on the property, all while his father owned it. These facts are sufficient for the jury to conclude that the purchase by Mr. Loessin from his brothers was a family matter and not a sale at arm's length for full market value.

The evidence does show that profitable gin operations had ceased, and that salvage value of the gin was low.

We also note that the appraised value of this property in 1955 by three Williamson County appraisers for inheritance tax purposes was $20,000. This evidence was offered by appellants, and is approximately twice the figures given by appellants' only expert value witness.

In cases of this kind we are not so concerned that all values may be too high or too low. It is the diminution in value which is important. See Southwestern Bell Tel. Co. v. Willie, Tex.Civ.App., Austin, 329 S.W.2d 466, writ dism.

 After considering all the evidence, we have concluded that the jury verdict is not so against the weight of the evidence as to be clearly wrong or manifestly unjust.

Appellants' last point is that the cumulative effect of all the errors was to produce an excessive verdict. We do not think so.

Finding no reversible error, we affirm the judgment of the Trial Court.

Affirmed.