**R. M. WILLIAMS, Appellant,**

**v.**

**GENERAL MOTORS ACCEPTANCE CORPORATION et al., Appellees.**

**No. 14634.**

Court of Civil Appeals of Texas.

San Antonio.

March 27, 1968.

Rehearing Denied April 24, 1968.

Rizik & Lieck, San Antonio, for appellant.

Clemens, Knight, Weiss & Spencer, Beckmann, Stanard, Wood & Vance, San Antonio, for appellees.

KLINGEMAN, Justice.

General Motors Acceptance Corporation, hereinafter referred to as GMAC, brought suit on a conditional sales contract between Smith Motor Sales, hereinafter referred to as Smith, as seller and R. M. Williams, hereinafter referred to as Williams, as purchaser of a 1965 Chevrolet Diesel Tractor,

which contract was assigned by Smith to GMAC. Williams filed a cross-action against GMAC and a third-party action against Smith for fraud, breach of warranty and rescission. Smith filed a cross-action against Williams for down payment allegedly due it. Trial was to a jury and judgment entered by the trial court for GMAC against Williams in the amount of $9,194.81, interest and cost of suit, and for foreclosure of GMAC's lien on the tractor. Judgment was also entered in favor of Smith against Williams in the amount of $950.00, and that Williams take nothing on his cross-action against GMAC and his third-party action against Smith.

Williams, by his first five points of error, asserts there is no evidence or insufficient evidence to support the jury's answers to Special Issues Nos. 2, 7 and 12, and that the jury's answers to these special issues are against the overwhelming preponderance of the evidence.

■■■ Special Issue No. 1 reads as follows: "Do you find from a preponderance of the evidence that the brochure (Cross-Plaintiff's Exhibit No. 2) given by Smith Motor Sales to R. M. Williams represented as a fact the following: 'While it's a more costly way to build an engine, it's unbeatable where results really count, and this characterizes every phase of the Detroit Diesel design and manufacturing policy. Though the initial investment is substantial, a Detroit Diesel can pay it back fast in savings on the job, thanks to the superior efficiency, durability, and performance that result from building the highest design, material, and manufacturing standards throughout.' Answer 'It did' or 'It did not.' We, the jury, answer: It did."

Special Issue No. 1 quotes from a brochure containing approximately 16 pages on "1965 CHEVROLET TRUCKS," given to Williams by a representative of Smith in the negotiations relative to the purchase of the truck, and is taken from page 10 under the heading "2-CYCLE CHEVY-GM-DE-TROIT DIESEL ENGINES." The jury found by Special Issue No. 2 that such representation was not false as to the diesel truck delivered to Williams.

Williams' contentions that such representation was false are basically founded on his own testimony and that of his shop foreman, Clyde Peek, as to alleged excessive repairs made on such truck in the 90-day period they operated it, and on their testimony that such truck was inoperable 31½ days out of approximately 90 days that Williams had the truck. This testimony is controverted both as to the amount of the repairs and as to the period of time that the truck was inoperable, by testimony of appellees' witnesses. It is to be noted that Special Issue No. 1 is restricted to representations in regard to the engine alone, and a careful examination of all the testimony as to the amount of repairs shows that the majority of such repairs do not involve the engine itself. Williams and Peek both testified that the engine used excessive oil, that it sprayed oil, and that the engine lugged when it had a 72,000-pound gross load. There was controverting testimony that the amount of oil used was not excessive, that all diesel engines sprayed oil, and that engine lugging was due to the driver's inexperience. There is no expert testimony that the statements contained in the brochure were false. On the other hand, there was testimony that the statements in such brochure were true. E. L. Smith, merchandising manager for new trucks for the Chevrolet Motor Division, when questioned directly as to the quoted portion of the brochure, testified that such statements were true. He further testified that the two leading types of diesel engines were Cummins and Detroit Diesel. W. B. Crimm, a truck salesman for Smith at the time of the sale and who was referred to by another witness as a highly qualified truck man, when questioned directly as to the brochure, testified that he found no errors in it. There was testimony that such truck when repossessed had a mileage of 25,700 miles and that this was a good use for the period of time it was owned.

It is the province of the trier of the facts to judge the credibility of the witnesses and the weight to be given their testimony, and the jury, after hearing the testimony, found such representation not to be false. After a careful examination of the entire record, it is our opinion that the jury's answer to Special Issue No. 2 is sufficiently supported by the evidence.

By their answer to Special Issue No. 6, the jury found that the seller represented as a fact to Williams that the diesel truck ordered by Williams could perform the job required by Williams in the operation of his brick plant; and in answer to Special Issue No. 7, the jury found that such representation was not false.

The requirements referred to appear to be based upon Williams' negotiations relative to the purchase of the truck with a representative of Smith, in which Williams told such representative that he needed a truck in his brick business that could haul a total gross load of 72,000 pounds (which is generally referred to as the GCW rating, being the gross combination weight of the truck and load); that such truck would be used to go to Houston twice a day, would have to go over curbs to be unloaded; and would have to have a brick unloader, so that one man could unload the truck. The representative of Smith, W. B. "Buddy" Crimm, thereafter drew up specifications for such a truck and such specifications were submitted to Williams and were introduced into evidence. The testimony discloses that in order to carry the 72,000-pound gross load, which is the legal limit in Texas, such truck would have to have a tandem axle installed on it, and it is undisputed that such an axle was installed by Fruehauf Trailer Company.

Williams testified that the truck required extensive repairs; that the truck was inoperable for 31½ days out of 90 days; and that it could not carry 72,000 pounds without caving in. This testimony was in part supported by testimony of his plant manager, Peek. This testimony was controverted by a number of appellees' witnesses on all points. Crimm testified that in his opinion the truck was entirely capable of doing the job, and that it could carry a 72,000-pound gross load. Sid Bowdler, truck manager for Smith, testified that such truck was capable of carrying 72,000 pounds, that it was capable of making the trip to Houston and operating for a man in the brick business. E. L. Smith testified that the truck in question was capable of handling the 72,000-pound maximum load at the speed in the specifications; that said truck could be used to go over curbs, and that it would haul a full load. Peek, Williams' foreman, testified that the truck did make trips to Houston and it did carry 72,000 pounds, but that when it did it would lug. There was testimony that lugging is due to driver inexperience. Although Williams testified that such truck could not carry 72,000 pounds without caving in, the record shows that the one time when such truck was weighed, the gross weight of the vehicle (GCW) was 73,600 pounds, or 1,600 pounds over the 72,000-pound load requirement. As hereinbefore noted, the testimony as to the excessive amount of repairs and the time that the truck was inoperable was also controverted.

The answer of the jury to Special Issue No. 7 is sufficiently supported by the evidence.

In answer to Special Issue No. 11, the jury found that the seller represented that the truck could haul a full load twice a day to Houston, Texas; and in Special Issue No. 12 they found that such representation was not false. Williams testified that the truck could and did make two trips a day to Houston on various occasions, and that the truck went to Houston twelve to thirteen times each month for the three months they had it. Williams' foreman, Peek, testified that the truck did make trips to Houston, that it carried 72,000 pounds when it did, which is the maximum legal limit in Texas, and that such truck could and did make two trips a day to Houston. The testimony shows that such truck

was also used to haul bricks in the immediate San Antonio area and to other points outside the San Antonio area. There is testimony that Williams also owned a larger diesel truck which cost approximately $18,000, which he procured one day before he got the Chevrolet diesel, and which was also used in his operations. It is undisputed that the Chevrolet truck at the time of its repossession had a mileage in excess of 25,000 miles, and even if it be assumed that Williams' testimony was true, that the truck only operated sixty days during the period of time he had it, this would be an average of over 400 miles a day.

The jury's answer to Special Issue No. 12 is sufficiently supported by the evidence.

■ Williams by his sixth point of error complains that the trial court erred in excluding the testimony of the witness Grubbs. Grubbs' testimony can be summarized as follows: He was in the truck leasing business and operated 21 diesels; he was familiar with the Chevrolet diesel and had on one occasion examined Williams' Chevrolet diesel truck; he had a Chevrolet diesel which was basically similar to Williams' except that it was a single axle truck; he had considerable trouble with it; it got hot, thermostat wasn't right, the solonids would go out; he had to change electrical systems; it blew oil out over the trailer; he was of the opinion that General Motors should do something about the truck and they didn't; the truck was still giving him trouble; it would pull the 11,000 pound load for which he purchased it, but that was about all; it wouldn't give the fuel mileage it should. Appellees objected to such testimony on the grounds that such witness was not qualified as an expert witness; that the evidence sought to be introduced was of a separate transaction and a separate vehicle and was not competent testimony as to the truck involved in the lawsuit; that there was no evidence showing that it was the same type of truck, or put to the same use; and that if such testimony were allowed it would open the door for appellees to bring in the testimony of all satisfied customers they could find. Such testimony was excluded.

Generally, evidence to show defects in a piece of machinery under investigation by showing that another machine by the same builder was defective is not admissible testimony. Fetzer v. Haralson, 147 S.W. 290 (Tex.Civ.App.—San Antonio 1912, writ ref'd). In any event it would be necessary to show that such machines were identical or so similar that the proposed evidence would reasonably tend to establish the truth of the inquiry, and also to show that such machines were operated under the same or similar conditions. See Hill v. Hanan & Son, 62 Tex.Civ.App. 191, 131 S.W. 245 (1910, no writ); Haynie v. Plano Mfg. Co., 36 Tex.Civ.App. 567, 82 S.W. 532 (1904, no writ). We find no error of the trial court in excluding such testimony.

■ Appellant also complains that the court erred in overruling his motion for new trial on the grounds of newly discovered evidence. Appellant in the hearing on such motion offered in support thereof the testimony of Roger Stoskopf, Branch Manager of International Harvester in San Antonio, Texas, who testified that the Detroit diesel engine was used by International Harvester in some of its trucks, and that he would not sell the type of engine in question for a 72,000-pound load. However, he testified that he was "sure it would pull it," and further testified that he was no expert on Chevrolets. He testified that the Detroit diesel engine was used by other manufacturers and that this fact was well known in the trucking industry; that it is a sound engine; that there is no secret that they used this type of engine; that they advertised it; and that they were listed in the San Antonio telephone directory as a representative for Detroit Diesel, and that other companies were also listed as representatives of Detroit Diesel in San Antonio.

Appellant also offered the testimony of Pierre Bernard, a truck salesman with

International Harvester in San Antonio, who testified that he was familiar with the Detriot Diesel 6V–53N engine and that he would not sell an International Harvester truck with this engine for the purpose of hauling a 72,000-pound pay load. When asked whether such diesel engine could haul a gross weight capacity load of 72,000 pounds, he stated that it would depend on various factors and that he wouldn't qualify himself as an expert on General Motors trucks. He stated that their Company, International Harvester, was one of the authorized representatives of Detroit Diesel in San Antonio, and that the Detroit Diesel engine was used by other truck manufacturers. Both appellant and his attorney testified that they did not know that Detroit Diesel was used by other truck manufacturers prior to the trial, and that such information was not discovered until after the trial.

The Supreme Court in New Amsterdam Casualty Company v. Jordan, 359 S.W. 2d 864 (1962), set forth the requirements for granting a new trial on the grounds of newly discovered evidence as follows:

> " 'A new trial will not be granted on the ground of newly-discovered evidence, unless it is made to appear that it has come to the knowledge of the applicant since the trial; that it could not have been sooner discovered by the exercise of diligence; that it is not merely cumulative; that it is not for the purpose of impeachment.' Conwill v. Gulf, C. & S. F. Ry. Co., 85 Tex. 96, 19 S.W. 1017 (1892)."

This Court in Austin v. Gallaher, 417 S.W.2d 363, 368 (1967, writ dism'd), said: "An indispensable element for the granting of a new trial on the grounds of newly discovered evidence is that movant exercised due diligence to discover the evidence. Foster v. McClain, Tex.Civ.App., 197 S.W. 2d 508, no writ; 41 Tex.Jur.2d, New Trial, § 109 (1963). The evidence must not be merely cumulative of the evidence already received, and must be of such

a character as will probably change the result on another trial, and the question of whether the new evidence will probably have this effect is one to be determined by the trial court in its discretion. Munden v. Chambless, Tex.Civ.App., 315 S.W.2d 355, writ ref'd n. r. e.; Texas Emp. Ins. Ass'n v. Pillow, Tex.Civ.App., 268 S.W.2d 716, writ ref'd n. r. e.; 41 Tex.Jur.2d, New Trial, §§ 118 and 122."

Appellant failed to show that he was entitled to a new trial on the grounds of newly discovered evidence and the court did not commit error in this respect.

Appellant's eighth and last point of error is that reversible error was committed by counsel for appellee, Mr. Wood, during counsel for appellant's closing argument, when he repeatedly injected prejudicial and unsworn testimony before the jury, and that the court's instruction to the jury could not remove the damage and harm that had been done.

During the course of counsel for appellant's closing argument to the jury, he stated: "They have made several comments that we have not sued General Motors. Well, I don't feel that we should have to go to Detroit and sue General Motors." At this point, counsel for Smith stated, "They can sue them right here." After some discussion as to whether General Motors would have to be sued in Detroit, appellant's counsel stated, "I am objecting to him testifying in front of this jury." The record then reflects "COURT INSTRUCTS JURY," without setting forth such instruction.

During the trial, numerous references were made to the warranty on the truck and that it was issued by General Motors, and such warranty was introduced into evidence, all without objections from appellant. Counsel for Appellee Smith in his opening statement before the jury stated that his client did not warrant the truck and he intended to prove by evidence that this "was up to General Motors, and General Motors has not been made a party

to this case \* \* \*." Counsel for appellant made no objection to this statement.

 As a general rule, in order to entitle one to a new trial because of improper argument of counsel, it must be shown that objection was made and overruled at the very time the argument was made, and it is only when the probable harm or the resulting prejudice cannot be eliminated or cured by retraction or instruction that a new trial will be awarded in the absence of timely objection. Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 856 (1954); Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054 (1940); Dallas Railway & Terminal Co. v. Clayton, 274 S.W.2d 422 (Tex.Civ. App.—Dallas 1954, writ ref'd n. r. e.); 41 Tex.Jur.2d, New Trial, § 31; 56 Tex. Jur.2d, Trial, § 324. The discussion of venue of the suit, complained of by appellant, was first interjected before the jury by argument of counsel for appellant. A new trial will ordinarily not be granted where unauthorized statements were provoked by the arguments of the opposing counsel, and will also be denied if any prejudicial effect of improper argument was cured by admonition or instructions of the court. 41 Tex.Jur.2d, New Trial, § 30. Before a judgment is reversed because of argument of counsel, the argument must be improper, and it must be such as to satisfy the reviewing court that it is reasonably calculated to cause and probably did cause rendition of an improper judgment in the case. Aultman v. Dallas Ry. & Terminal Co., 152 Tex. 509, 260 S.W.2d 596 (1953); Texas General Indemnity Co. v. Bridwell, 304 S.W.2d 131 (Tex.Civ.App.—Beaumont, 1957, writ ref'd n. r. e.).

After a careful consideration of the record before us, we find nothing contained in the argument complained of that could not have been cured by proper instruction of the court. The record does not establish any reversible error of the trial court pertaining to the matter of argument of counsel. Appellant's eighth point of error is overruled.

All of appellant's points of error are overruled and the judgment of the trial court is affirmed.

CADENA, J., not participating.