The judgment of the Court of Civil Appeals is affirmed.

Thelma HOWARD et al., Petitioners,

v.

Raymond SALMON, Respondent.

No. A–8727.

Supreme Court of Texas.

July 25, 1962.

Rehearing Denied Oct. 3, 1962.

Vincent Stine, Henrietta, for petitioners.

Earl C. Fitts, Nocona, Fillmore, Schaeffer & Fillmore, Wichita Falls, for respondent.

CALVERT, Justice.

Writ of error was granted in this case on points of error complaining of improper jury argument.

Mrs. Maria Hoben, a widow, died in February, 1960, leaving a will written and signed by her in 1946. The will was offered for probate in the County Court of Montague County by respondent, Raymond Salmon, sometimes known as "Boss" Salmon, a half-brother of Mrs. Hoben. A contest was filed by Thelma Howard and Helen S. Henley, petitioners, half-sisters of Mrs. Hoben. The will was admitted to probate by the County Court, and the contestants appealed to the District Court where the issues made by the pleadings were tried to a jury. The jury answered all issues favorably to respondent, and judgment was rendered and entered admitting the will to probate and certifying the judgment to the County Court for observance. The Court of Civil Appeals affirmed, 359 S.W.2d 120.

By the terms of her will Mrs. Hoben left all of her property to her four half-brothers, Raymond Salmon, Fred Salmon, Harry Salmon and Wilburn Salmon, known as Bill Salmon. Some preference was shown respondent. Nothing was devised or bequeathed to Thelma Howard, Helen S. Henley or Lottie Downard, half-sisters of the deceased. Harry Salmon predeceased Mrs. Hoben, leaving surviving him two children, Gwendolyn Saunders and Mattie Lenora Dunlap.

On Tuesday following the funeral of Mrs. Hoben on Saturday, the will was procured by the attorney for petitioners here and was read aloud by him at Mrs. Hoben's residence to the three surviving half-brothers and two of the half-sisters. The sisters were disappointed that nothing had been left to them. To this point there is no disagreement as to the facts.

All of those present at the meeting just described testified as witnesses at the trial. All except respondent testified that a discussion following the reading of the will led to an oral agreement on the part of all present that the will would not be offered for probate and that the property of Mrs. Hoben, other than certain bonds and after the payment of debts, would be divided according to the laws of descent and distribution, and that Mrs. Howard should qualify as administratrix of the estate. Respondent testified that he did not agree that the will should not be probated and did not agree to divide the property according to the laws of descent and distribution.

Probate of the will was contested on the ground that respondent had made the agreement described above, that he had renounced the will, and that he had waived all

rights under the will. Three special issues, all answered in the negative, were submitted as follows:

SPECIAL ISSUE NO. 1:

"Do you find from a preponderance of the evidence that on or about February 23, 1960, at the meeting held at Mrs. Hoben's house, Raymond Salmon renounced the will of Mrs. Hoben?"

SPECIAL ISSUE NO. 2:

"Do you find from a preponderance of the evidence that on or about February 23, 1960, at the meeting held at Mrs. Hoben's house, Raymond Salmon waived all rights under Mrs. Hoben's will?"

SPECIAL ISSUE NO. 3:

"Do you find from a preponderance of the evidence that all of the heirs of Mrs. Hoben agreed· to the effect that Mrs. Hoben's will would not be offered for probate; that the property (other than the U. S. Government Bonds) would be divided in accordance with the laws of inheritance; and that Thelma Howard should be appointed administratrix of Mrs. Hoben's Estate?"

With the issues thus drawn, first counsel speaking for respondent introduced the main course of his argument to the jury in this language:

"Now, what kind of a law suit are we confronted with here today? What is the sole purpose that you have confronting you? I will tell you what it is. You have got some disgruntled people, and *they want you to re-write that lady's will for her,* that lady who lies yonder in that cemetery who had her last say, and they are not satisfied with it. *They want you to re-write her will.*"

Counsel told the jury that next to life, liberty and some assurance that one is going to meet his Maker, the most sacred thing we have in our land is the right to dispose of our property by will in such manner as we see fit, and continued:

"Do you want the day to ever come that when you are gone somebody will stand here in this courthouse, or some other courthouse, and question how you left your property? That is a right that is sacred. Let's keep it sacred."

Counsel then called attention to the fact that the meeting of the brothers and sisters was held on "the following Tuesday after she was put away on Saturday," and stated that *"they started to try to change the will immediately.* They didn't wait until the next day. They didn't wait until the next hour." He commented that petitioners were trying to tell the jury that respondent agreed not to probate the will, or not to take under it, "because *they want you to re-write Maria Hoben's will for her."* He stated that there was only one deduction that could be made from the evidence and that was that Mrs. Hoben had "left her property to the person who had been the kindest, who had been the most thoughtful, and who had been the most considerate for her welfare over the years."; that she left the principal portion of the property to respondent "because she wanted him to have it." Counsel read special issue number 1 to the jury, and stated: "They want you to answer that yes or no. If you believe from the evidence that it should be answered yes, then answer it that way *and help them re-write the will."* An objection was made to the last statement and the jury was instructed not to consider it.

Counsel who made the closing argument for respondent stated that he knew that the jury would apply the same knowledge and same determination to the trial of the case as they would want applied to a case of theirs "if you were sitting here trying to determine whether or not the rights under a will of some of your relatives should be upheld or not." Attention of the jury was again called to the fact that a person has

a right to dispose of his property as he wishes, and counsel continued:

"Now, ladies and gentlemen, is that what you want done in connection with your property? Would you want to have the same procedure followed, when you decide some day while your mind is good, and not one word of testimony against it, when you decide—."

At this point objection was made and sustained, but counsel stated:

"It is a good law that tells you that you have a right to will your property to anybody you want to. If you did that, you wouldn't expect somebody to sit down and cut it up some way other than what you had decided you wanted it to go.

"*Just uphold the will* ladies and gentlemen. That's all Raymond Salmon is asking you. *Uphold the will* of a woman who had a sound mind, and she was strong in body, mind, and spirit. That is all he is asking you to do; *just uphold the will.*"

The closing statement left by respondent's counsel with the jury was this:

"Ladies and gentlemen, *uphold the will of Mrs. Hoben,* who is not here, but who had a good mind, doing her business, driving her car, going about taking care of her own affairs. She told you how she wants her property to go. Now, *won't you let it stand like she wrote it?*"

We have emphasized language of the two jury arguments which indicate a studied plan to divert the attention of the jury from the only issues in the case, as to which there could be little or no passionate feeling, to issues not in the case on which an appeal could be made to the deepest passion and strongest prejudice counsel could imagine. Predicate was laid in the statement that next to life, liberty and the hope of meeting our Maker, the thing most sacred to us in this country is the right to dispose of our property as we wish. First counsel then dinned the jurors ears with the refrain: "Don't re-write Mrs. Hoben's will, don't re-write the will, don't re-write the will." Second counsel made certain that the message of the false issue touched the jurors deeply by asking them to put themselves in Mrs. Hoben's position, stating over a sustained objection that if they disposed of their property by will they wouldn't expect somebody to "cut it up" [the property] in a different manner. Then counsel took up the refrain: "Uphold Mrs. Hoben's will, uphold the will, uphold the will, uphold the will."

As the case went to trial Mrs. Hoben's will was not under attack, for either re-writing or invalidation. The special issues assumed the will was a valid will, and no one suggested that it needed re-writing. The only questions to be decided by the jury were whether the parties had orally contracted not to probate it and to take under the laws of descent and distribution, whether respondent had voluntarily renounced it and whether he had waived his rights under it. The argument was highly improper. Moreover, we are satisfied from the record before us that it "was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case" within the meaning of Rule 503, Texas Rules of Civil Procedure, and thus requires a reversal of the judgments of the courts below.

The circumstance which unbalances the scales in favor of reversal is the state of the evidence. The Court of Civil Appeals overruled points of error asserting that the verdict of the jury was against the great weight and preponderance of the evidence, and that holding is well within the right of the court and is final and binding on this court. Article V, Section 6, Constitution of Texas, Vernon's Ann.St. But it does not take from this court the right to consider the state of the evidence in determining whether the improper argu-

ment requires reversal. Lumbermen's Lloyds v. Loper, 153 Tex. 404, 269 S.W.2d 367; Houseman v. DeCuir, 155 Tex. 127, 283 S.W.2d 732.

It would serve no useful purpose to set out the testimony of the witnesses in detail. It is enough to observe that the four brothers and sisters, other than respondent, and the attorney, who were present at the meeting when the discussion occurred, gave substantially identical testimony of what was said and done. All of the brothers stand to lose, not gain, by enforcement of the agreement. Fred and Wilburn Salmon had no self-interest to serve by their testimony. As a matter of fact, the testimony is that Fred was reluctant to make the agreement. The attorney had no self-interest to serve by his testimony. While the jury possibly could have found from a dispassionate weighing and appraisal of the testimony, uninfluenced by the appeal to prejudice of the improper jury argument, that respondent's version of the discussion was correct, we think it highly improbable that it did so.

We are not unmindful of the fact that counsel for petitioners did not object to the line of improper argument as often or as strenuously as he could and should have, nor did he request the court to instruct the jury not to consider it. We are satisfied, however, that the appeal to prejudice was so strong that instruction could not have eliminated its effect on the verdict. It is no longer necessary that improper argument fit into some pre-Rule 503 category to authorize or require reversal. For, as we said in Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W.2d 856, 858:

"What matters it that the argument is of a particular type or falls into a particular category? The true test is the degree of prejudice flowing from the argument—whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that

a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict."

Moreover, when objection was made and sustained, counsel continued with the same line of argument, and this in itself has been held to be a factor in determining whether reversal should be ordered. Houseman v. DeCuir, 155 Tex. 127, 283 S.W.2d 732, 735.

Many questions of law were raised by respondent in the trial court by special exceptions and by motion for an instructed verdict. Only one of the questions has been preserved for appellate review. It is that the trial court erred in overruling respondent's motion to strike petitioners' testimony. The argument made by respondent is that the testimony should have been stricken because it discloses that the agreement which petitioners seek to enforce would have the effect of transferring title to real estate which by the provisions of Section 37 of the Texas Probate Code became vested under the will immediately upon Mrs. Hoben's death, and thus is prohibited by Article 1288, the Statute of Conveyances, and Article 3995, the Statute of Frauds. We are not disposed to decide what property is affected by the agreement unless and until an agreement is established.

We should note certain questions which were raised in the trial court but which we have not decided. We have not held that a mere oral unilateral renunciation or waiver by a devisee or legatee under a will, almost immediately retracted, can be enforced against him in the absence of facts giving rise to estoppel. Neither have we held that the evidence establishes or would support an enforceable contract. Decision of these and other questions must await proper presentation.

The judgments of the Court of Civil Appeals and the trial court are reversed and the cause is remanded to the trial court.